*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0064P (6th Cir.)
File Name:  00a0064p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

RONALD DEAN COMBS,
　　*Petitioner-Appellant,*

　　　*v.*

RALPH COYLE,
　　*Respondent-Appellee.*



No. 97-4369

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 95-00733—Sandra S. Beckwith, District Judge.

Argued:  November 2, 1999

Decided and Filed:  February 23, 2000

Before:  NORRIS, DAUGHTREY, and MOORE, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:**  Richard A. Chesley, JONES, DAY, REAVIS &
POGUE, Chicago, Illinois, for Appellant.  Stuart A. Cole,
OFFICE OF THE ATTORNEY GENERAL OF OHIO,
Columbus, Ohio, for Appellee.  **ON BRIEF:**  Richard A.
Chesley, JONES, DAY, REAVIS & POGUE, Chicago,
Illinois, Jenny L. Klitch, JONES, DAY, REAVIS & POGUE,

1

Columbus, Ohio, Linda E. Prucha, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Stuart A. Cole, Jonathan R. Fulkerson, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee.

MOORE, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. NORRIS, J. (p. 42), delivered a separate opinion concurring in part and dissenting in part and joined in the judgment.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. Petitioner-appellant Ronald Dean Combs was convicted by an Ohio jury of two counts of aggravated murder as well as a specification of an aggravating circumstance as to each count, and he was sentenced to death. Combs now appeals the district court's denial of his petition for a writ of habeas corpus. His brief sets forth twenty-nine claims, including various claims of ineffective assistance of counsel, prosecutorial misconduct, trial court error, and challenges to the constitutionality of his death sentence. For reasons that will be explained below, we conclude that Combs's trial counsel rendered ineffective assistance so egregious as to make us doubt whether Combs's trial produced a just result. Accordingly, we **REVERSE** the district court's judgment and **REMAND** to the district court for issuance of a writ of habeas corpus conditioned upon the State of Ohio granting Combs a new trial within a reasonable period of time.

## I. BACKGROUND

On July 15, 1987, Ronald Dean Combs shot and killed Peggy Schoonover and her mother, Joan Schoonover. Peggy Schoonover and Combs had been involved in a relationship and had a child together, a son named Joseph. The shootings took place in the Holiday Park Tower parking lot in

---

**CONCURRING IN PART, DISSENTING IN PART**

---

ALAN E. NORRIS, Circuit Judge, concurring in part and dissenting in part.

I concur with the majority's decision in Part II.B.3 and agree that a writ of habeas corpus should be issued on this ground. Because petitioner did not argue that introduction of his "talk to my lawyer" statement violated his right to remain silent, I respectfully dissent from Part II.B.2 of the majority's opinion.

downtown Cincinnati, and an off-duty police officer, Deputy Sheriff James Neil, witnessed the shootings. Neil ordered Combs to freeze, but when Combs made an aggressive move and refused to drop his shotgun, Neil fired six gunshots at Combs. Combs was taken to the hospital and underwent extensive treatment for his gunshot wounds. His right arm was amputated, and his left arm was left partly paralyzed.

Combs was charged with two counts of aggravated murder, which is defined as "purposely, and with prior calculation and design, caus[ing] the death of another." OHIO REV. CODE ANN. § 2903.01(A) (Banks-Baldwin 1997). Each count contained a specification of an aggravating circumstance, namely that the offense "was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons." Joint Appendix (hereinafter "J.A.") at 9 (Indictment); OHIO REV. CODE ANN. § 2929.04(A)(5) (Banks-Baldwin 1997). Under Ohio law, a defendant becomes eligible for the death penalty if he is convicted of or pleads guilty to aggravated murder as well as at least one of the aggravating circumstances set forth in § 2929.04. *See* OHIO REV. CODE ANN. § 2929.03(C)(2) (Banks-Baldwin 1997).

At trial, Combs did not contest that he fired the two shots that killed Peggy and Joan Schoonover. Instead, his defense was that he was too intoxicated from alcohol and drugs to form the requisite intent to kill the women or to have committed the killings with prior calculation and design. To support this theory, Combs presented the testimony of several witnesses who had seen him ingesting substantial quantities of alcohol and drugs in the days prior to and on the day of the shootings. Defense witness Dr. Roger Fisher, a clinical psychologist, also testified that, in his expert opinion, Combs was under the influence of drugs and alcohol at the time of the shootings. However, on cross examination, Fisher explained his belief that Combs, while intoxicated, was nevertheless acting with intent and purpose.

On February 17, 1988, a jury found Combs guilty of both counts of aggravated murder as well as the specification of an

aggravating circumstance as to each count. Following a sentencing hearing conducted on February 22, 1988, the jury returned a verdict imposing a sentence of death. Pursuant to Ohio Revised Code § 2929.03(D)(3), the trial court independently reviewed all the evidence and, upon concluding that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt, it adopted the jury's recommended sentence of death.

Combs then unsuccessfully pursued direct appeals and state post-conviction relief. Combs's conviction was affirmed by the state court of appeals on September 19, 1990, *see Ohio v. Combs*, No. C-880156, 1990 WL 135000, at *9 (Ohio Ct. App. Sept. 19, 1990) (unpublished opinion), and by the Ohio Supreme Court on December 18, 1991, *see Ohio v. Combs*, 581 N.E.2d 1071, 1084 (Ohio 1991), *reh'g denied*, 583 N.E.2d 974 (Ohio), *cert. denied*, 504 U.S. 977 (1992). Combs filed a petition for post-conviction relief pursuant to Ohio Revised Code § 2953.21 raising fifty-nine claims for relief, which was denied by the court of common pleas on May 20, 1993. J.A. at 420 (Ct. C.P. Denial of Pet. to Vacate). The court of appeals affirmed the denial of relief, *see Ohio v. Combs*, 652 N.E.2d 205, 218 (Ohio Ct. App. 1994), and the Ohio Supreme Court declined jurisdiction over Combs's discretionary appeal, *see Ohio v. Combs*, 644 N.E.2d 1028 (Ohio), *recons. denied*, 646 N.E.2d 469 (Ohio 1995). In June of 1993, Combs filed an application for delayed reconsideration in the court of appeals; this application was denied on February 22, 1994. J.A. at 363-64 (Entry Denying App. for Delayed Recons.). The Ohio Supreme Court affirmed the denial without opinion. *See Ohio v. Combs*, 634 N.E.2d 1027 (Ohio), *recons. denied*, 638 N.E.2d 86 (Ohio 1994), *cert. denied*, 513 U.S. 1167 (1995).

After exhausting all state court remedies, Combs filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 2254. Combs's petition asserted fifty-three claims for relief. After finding all of these claims to be either procedurally barred or without merit, the district court denied

*Id.* (citation omitted). Although the Ohio Supreme Court found that these comments did not warrant reversal, the State should avoid such speculation on retrial.

### III.  CONCLUSION

Based on the preceding analysis, we conclude that Combs's trial counsel rendered constitutionally ineffective assistance at the culpability phase of Combs's trial. We therefore **REVERSE** the district court's judgment and **REMAND** the case to the district court with instructions to issue a writ of habeas corpus unless the State of Ohio retries Combs within a reasonable period of time.

childhood? Was she thinking about her daughter take me but spare Peggy? That's the aggravating circumstance, what she went through. Or maybe she started to pray, we don't know. He won't tell us.

. . . .

. . . What did she [Peggy] think when this now hot steal [sic] pressed against the back of her head, she knew she too wasn't going to be given any mercy. What went through her mind, what was she thinking? Was she thinking of little Joey, who's going to take care of him, grandma is gone, I'm going to be gone, who's going to raise my little boy. And then came the pull of that second trigger, and she's gone. That's the aggravating circumstance, that's what you put in your one hand and even if you do find some mitigation and all that that the defendant told you, weigh that.

. . . .

. . . What weighs more, these two totally good lives or the defendant's life in the fast lane?

R. at 1404-06; J.A. at 2783-85.

The Ohio Supreme Court on direct review of Combs's case concluded that these prosecutorial comments were erroneous as a matter of state law. *See Combs*, 581 N.E.2d at 1077. The court explained:

After reading his entire argument, we conclude that the prosecutor did err. The prosecutor did improperly suggest that how the victims were killed and the suffering and mental anguish the victims endured was an aggravating circumstance. Improperly injecting nonstatutory aggravating circumstances is error. By continually referring to what the victims were thinking, the prosecutor engaged in gross speculation.

relief on October 23, 1997. J.A. at 231 (D. Ct. Op.). The district court issued a certificate of probable cause on December 17, 1997. We have jurisdiction over Combs's timely appeal of the district court's judgment pursuant to 28 U.S.C. § 2253.

Combs's appeal sets forth twenty-nine claims for relief; these claims fall under the headings of ineffective assistance of trial counsel at both the culpability and sentencing phases, ineffective assistance of appellate counsel, prosecutorial misconduct, trial court error, and imposition of an unconstitutional sentence of death. Because our resolution of Combs's ineffective assistance of trial counsel claim renders unnecessary a decision on the others, we will confine our opinion to an analysis of the ineffectiveness claim. Additionally, we will briefly discuss trial errors that have been identified by the Ohio state courts so as to ensure that these errors are avoided on Combs's retrial.

## II.  ANALYSIS

### A.  Procedural Default

It is well established that "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), we articulated an analysis that must be followed when a state argues that a habeas claim is defaulted because of a petitioner's failure to observe a state procedural rule. "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* at 138. "Second, the court must decide whether the state courts actually enforced the state procedural sanction." *Id.* "Third, the court must decide whether the state procedural forfeiture

is an 'adequate and independent' state ground on which the state can rely to foreclose review of a federal constitutional claim." *Id.* As we have previously stated: "For purposes of federal review in habeas cases, we may consider as an adequate and independent state procedural rule only a state procedural rule that was 'firmly established and regularly followed by the time as of which it [was] to be applied' . . . ." *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)) (alteration in original). If we determine that the state procedural ground was adequate and independent so as to bar review, the petitioner must then demonstrate cause and prejudice or a fundamental miscarriage of justice.

Whether a state court rested its holding on procedural default so as to bar federal habeas review is a question of law that we review de novo. *See Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). In answering this question, we look to "the last *explained* state-court judgment." *Id.* (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991)) (internal quotation marks omitted).

Combs has raised six separate claims of ineffective assistance of trial counsel at the culpability phase. Although one of these claims was presented on direct appeal and is therefore properly preserved, the other claims were first presented in Combs's state post-conviction petition. The State maintains that the state courts' dismissal of these claims under the doctrine of res judicata was proper, and that we should therefore refuse to review the merits of these procedurally defaulted claims. Combs argues that the first prong of the *Maupin* analysis is not satisfied because at the time he pursued his direct appeal, no state procedural rule mandated that his ineffectiveness claims be asserted on direct appeal.

The Ohio state courts relied on two cases to support the decision that res judicata barred consideration of the claims raised for the first time in Combs's post-conviction petition: *Ohio v. Perry*, 226 N.E.2d 104 (Ohio 1967), and *Ohio v.*

(1998); *Ohio v. Garner*, 656 N.E.2d 623, 631 (Ohio 1995), *cert. denied*, 517 U.S. 1147 (1996); *Ohio v. Grant*, 620 N.E.2d 50, 68 (Ohio 1993), *cert. denied*, 513 U.S. 836 (1994). On direct review of Combs's conviction, the Ohio Supreme Court cited *DePew* and explained that the reference to statutory mitigating factors not raised by the evidence was erroneous. *See Combs*, 581 N.E.2d at 1079. The court found, however, that the error did not require reversal because defense counsel induced the error by proposing the improper instruction. *See id.*

2. **Improper Characterization of the Nature and Circumstances of the Offense as a Nonstatutory Aggravating Circumstance**

The Ohio Supreme Court also concluded that the State erred by focusing its closing remarks on the victims' mental anguish prior to death, thereby converting the nature and circumstances of the offense into a nonstatutory aggravating circumstance. Under Ohio law, although prosecutors in the penalty phase of a capital case may properly refer to the nature and circumstances of the offense, it is improper to characterize that evidence as a nonstatutory aggravating circumstance. *See, e.g., Ohio v. Gumm*, 653 N.E.2d 253, 262-63 (Ohio 1995), *cert. denied*, 516 U.S. 1177 (1996); *Ohio v. Landrum*, 559 N.E.2d 710, 719 (Ohio 1990), *cert. denied*, 498 U.S. 1127 (1991); *Ohio v. Davis*, 528 N.E.2d 925, 931 (Ohio 1988), *cert. denied*, 488 U.S. 1034 (1989).

It is undisputed that the only aggravating circumstance listed in § 2929.04 for which Combs was convicted is that "the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." OHIO REV. CODE ANN. § 2929.04(A)(5) (Banks-Baldwin 1997). At the sentencing hearing, however, the State made the following closing argument:

Can you imagine the terror of that? A gun right to your head, was she [Joan] thinking of her husband, who was going to take care of him? Was she thinking about her

criminality of his conduct or to conform his conduct to the requirements of law.

Number 4, the youth of the defendant.

Number 5, the defendant's lack of significant history of prior criminal convictions and delinquency adjudications.

Number 6, if the defendant was [a] participant in the offense but not the principal offender, the degree of the defendant's participation in the offense and the degree of the defendant's participation in the acts which led to the death of the victim.

And number 7, any other factors that are relevant to the issue of whether the defendant should be sentenced to death.

Keep in mind that all of these specific factors may not be present in this case nor need they all be present before you can find that the aggravating circumstance is not sufficient beyond a reasonable doubt to outweigh the factors in mitigation of the sentence of death. Likewise the existence of any of the mitigating factors I have described to you does not preclude or prevent the imposition of a sentence of death if you find that the aggravating circumstance still does outweigh the mitigating factors by proof beyond a reasonable doubt.

R. at 1434-36; J.A. at 2804-06.

This instruction was clearly improper under Ohio law. In *Ohio v. DePew*, 528 N.E.2d 542 (Ohio 1988), *cert. denied*, 489 U.S. 1042 (1989), the defendant contended that an instruction on all mitigating factors, including ones inapplicable to the case at hand, impermissibly focuses the jury's attention on the absence of mitigating factors. *See id.* at 557. The court held that "[i]f the defendant chooses to refrain from raising some of or all of the factors available to him, those factors not raised may not be referred to or commented upon by the trial court or the prosecution." *Id.*; *see also Ohio v. Bey*, 709 N.E.2d 484, 495 (Ohio), *cert. denied*, --- U.S. ---, 120 S. Ct. 587 (1999); *Ohio v. Keith*, 684 N.E.2d 47, 65 (Ohio 1997), *cert. denied*, 523 U.S. 1063

*Cole*, 443 N.E.2d 169 (Ohio 1982). In *Perry*, the Ohio Supreme Court held that "[u]nder the doctrine of *res judicata*, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at the trial*, which resulted in that judgment of conviction, *or on an appeal* from that judgment." *Perry*, 226 N.E.2d at 106 syllabus para. 9. In *Cole*, the court recognized that there are exceptions to the absolute application of the *Perry* rule in proceedings for post-conviction relief when the criminal defendant claims ineffective assistance of trial counsel. *See Cole*, 443 N.E.2d at 171. The *Cole* court reasoned, however, that when a defendant, "upon direct appeal, was represented by new counsel who was in no way enjoined from asserting the ineffectiveness of appellant's trial counsel and [when] such question of effective counsel could fairly be determined without examining evidence outside the record, none of the qualifications engrafted upon the *Perry* decision is apposite." *Id.* at 171. The Ohio Supreme Court later commented that "*Cole* recognizes that *res judicata* does not apply when trial and appellate counsel are the same, due to the lawyer's inherent conflict of interest." *Ohio v. Lentz*, 639 N.E.2d 784, 786 (Ohio 1994).[1]

Combs asserts that the *Cole* rule requiring defendants to raise ineffectiveness claims on direct appeal does not apply to him because he did not have new appellate counsel. At trial, Combs was represented by two attorneys, Timothy A. Hickey and Chuck R. Stidham. On direct appeal, Stidham continued

---

[1] *Lentz* held that "[w]hen a criminal defendant is represented by two different attorneys from the same public defender's office at trial and on direct appeal, *res judicata* bars a claim of ineffective assistance of trial counsel raised for the first time in a petition for postconviction relief when such claim could have been made on direct appeal without resort to evidence beyond the record, unless the defendant proves that an actual conflict of interest enjoined appellate counsel from raising ineffective assistance of trial counsel on direct appeal." *Lentz*, 639 N.E.2d at 784 syllabus.

his representation of Combs and was joined by new co-counsel, R. Fred Hoefle. Combs argues that the same conflict of interest that would deter an attorney from alleging his own ineffectiveness is present when that attorney is simply joined by a new attorney on appeal.

The State acknowledges that counsel cannot be expected to raise his own ineffectiveness on appeal, but argues that res judicata was properly applied to Combs's situation. First, the State asserts that Combs's new counsel actually raised a claim of ineffective assistance of counsel against co-counsel on direct appeal, thus proving that there was no conflict.[2] Second, citing *Ohio v. Zuern*, Nos. C-900481, C-910229, 1991 WL 256497 (Ohio Ct. App. 1st Dist. Dec. 4, 1991) (unpublished opinion), the State argues that the rule in *Cole* applies as a matter of law to a situation in which new co-counsel participates in the appeal. *Zuern* presented a situation nearly identical to the instant case. In *Zuern*, the defendant challenged the state trial court's dismissal of post-conviction claims of ineffective assistance of counsel pursuant to *Cole*, arguing that res judicata was inapplicable because his appellate counsel consisted of one of his two trial attorneys joined by one new appellate counsel. *See Zuern*, 1991 WL 256497, at *11. The court of appeals rejected the defendant's argument: "Unless we presume . . . that new co-counsel entering upon a criminal case at the appellate level would deliberately not exercise his professional judgment or duty to assert the ineffectiveness of his co-counsel at trial if the record demonstrated a basis for such a claim, a presumption we adamantly reject, we perceive no reason why the reference in *Cole* to 'new counsel' would not embrace new co-counsel as well as new independent counsel." *Id.* at *12; *see also Ohio v. Swiger*, 708 N.E.2d 1033, 1039 (Ohio Ct. App. 9th Dist. 1998) (holding res judicata applicable when appellant was represented on direct appeal by trial counsel and a second new attorney); *Ohio v. Landrum*, No. 98 CA 2401, 1999 WL

---

[2]This point is irrelevant to the determination of whether the rule of *Cole* was regularly applied to situations such as Combs's at the time of his appeal.

## C. Trial Errors Identified by the Ohio Supreme Court

In its review of Combs's conviction and sentence, the Ohio Supreme Court found that several trial court errors had been committed, although that court determined that these errors did not warrant reversal. Because Combs will in all probability be retried for these killings, we will now briefly discuss the errors identified by the state court so that these errors will not be repeated.

### 1. Improper Penalty Phase Jury Instruction

At the conclusion of Combs's sentencing hearing, the trial court instructed the jury on all seven statutory mitigating factors, rather than just the two raised by defense counsel at the hearing. The instruction read:

What are mitigating factors? The statute provides certain mitigating factors, some of which you may not apply to this hearing. Mitigating factors are factors that while they do not justify an excuse or justify or excuse the crime of aggravated murder, nevertheless may be considered by you as extenuating, lessening, weakening, excusing to some extent or reducing the degree of the defendant's blame. You are to weigh as mitigating factors as you may deem applicable in this case the nature and circumstances of the offense, the history, background and character of the defendant, and the following factors which are mentioned by way of illustration and not for the purpose of limiting your consideration.

These seven mitigating factors are defined by statute as follows; number 1, whether the victim of the offense induced or facilitated it.

Number 2, whether it is unlikely that the offense would have been committed but for the fact the defendant was under duress, coercion, or strong provocation.

Number 3, whether at the time of committing the offense the defendant because of a mental disease or defect lacked substantial capacity to appreciate the

said that he was going to be with his father, who was dead. R. at 1192; J.A. at 2612 (Charles Hogue Test.); R. at 942 (Tony Liming Test.). Combs also argued that the car chase just prior to the shootings was not an effort to hunt the two women down, but rather an effort to talk with Peggy Schoonover after other channels of communication had been cut off.

The two critical errors by defense counsel bolstered the State's case and made Combs's explanation of the events seem less likely. Without Fisher's testimony and without the use of Combs's "talk to my lawyer" statement, the State's evidence of purpose and prior calculation and design would have been much weaker. We therefore conclude that absent defense counsel's errors, there is a reasonable probability that the jury would have concluded that the State did not meet its burden of proving the two contested elements, and thus that the jury would have had a reasonable doubt about Combs's guilt.

Federal habeas relief is available to petitioners in state confinement as a result of a proceeding that was rendered fundamentally unfair by a violation of the Constitution, laws, or treaties of the United States. *See Norris*, 146 F.3d at 323 (citing *Estelle v. McGuire*, 502 U.S. 62, 68 (1991)). The Supreme Court has explained that "[a]n ineffectiveness claim, . . . as our articulation of the standards that govern decision of such claims makes clear, is an attack on the fundamental fairness of the proceeding whose result is challenged." *Strickland*, 466 U.S. at 697. Combs has satisfied both prongs of the *Strickland* test, and in so doing he has demonstrated that his "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. He is therefore entitled to a conditional grant of habeas relief.[18]

---

[18]No harmless error analysis is necessary for claims of ineffective assistance of counsel. *See Kyles v. Whitley*, 514 U.S. 419, 435-36 (1995).

22626, at *12 (Ohio Ct. App. 4th Dist. Jan. 11, 1999) (unpublished opinion) (same); *Ohio v. Broom*, No. 72581, 1998 WL 230425, at *4 (Ohio Ct. App. 8th Dist. May 7, 1998) (unpublished opinion) (same); *Ohio v. Steffen*, No. C-930351, 1994 WL 176906, at *3 (Ohio Ct. App. 1st Dist. May 11, 1994) (unpublished opinion) (same); *Ohio v. Jamison*, No. C-910736, 1992 WL 333011, at *5 (Ohio Ct. App. 1st Dist. Nov. 10, 1992) (unpublished opinion) (following *Zuern* to hold that "the phrase 'new counsel' includes new co-counsel as well as new independent counsel," such that res judicata may be invoked to bar assertion of ineffective assistance of counsel claims). *But see Ohio v. Evans*, No. L-97-1134, 1998 WL 351884, at *4 (Ohio Ct. App. 6th Dist. June 19, 1998) (unpublished opinion) ("[W]e agree with the trial court that one additional counsel on appeal does not permit the application of res judicata to claims of ineffective assistance of counsel. It is unlikely that, as co-counsel with [trial counsel], [new counsel] would be inclined to assert a claim on appeal for ineffective assistance of trial counsel.").

However, *Zuern* was not decided until after the court of appeals had ruled on Combs's direct appeal.[3] We must instead look to established state law at the time Combs pursued his appeal. *Cole* was the authoritative case at that time, and *Cole* does not speak to a situation in which trial counsel continues on appeal with the addition of a new co-

---

[3]Even today, it is not clear that the *Zuern* rule would qualify as a firmly established state procedural rule. The Ohio Supreme Court has never spoken on the issue, and not all the courts of appeals agree with the outcome in *Zuern*. Furthermore, the reasoning in *Zuern* seems to be in tension with that of the Supreme Court of Ohio in *Lentz*. *Lentz* can be read for the proposition that if a new attorney represents a defendant on appeal, res judicata applies unless there is an actual conflict. There may well be an actual conflict in a situation in which trial counsel is simply joined by a new attorney on direct appeal, thus suggesting that the per se rule of *Zuern* is the incorrect approach.

counsel.[4]  Because there is ambiguity surrounding the issue and because the State cannot point to a case firmly establishing as of the time of Combs's appeal that ineffectiveness claims must be brought on direct appeal when trial counsel also serves as co-counsel on appeal, we are unable to conclude that a firmly established state procedural rule existed.  Indeed, at the time Combs's appeal was filed it would have been entirely reasonable to conclude that Combs's new counsel did not meet the *Cole* standard of being "in no way enjoined from asserting the ineffectiveness of appellant's trial counsel," *Cole*, 443 N.E.2d at 171, and thus that res judicata would not apply.

Because we conclude that no firmly established procedural rule mandated the bringing of ineffectiveness claims on direct appeal in Combs's situation, we may review the merits of all of those claims, including claims that the state court deemed barred by res judicata.

## B.   Ineffective Assistance of Trial Counsel at the Culpability Phase

We review a district court's denial of habeas corpus relief de novo, but we review any findings of fact made by the district court for clear error.  Findings of fact made by a state court are entitled to complete deference if supported by the evidence.  *See Norris v. Schotten*, 146 F.3d 314, 323-24 (6th

---

[4]In a previous decision, we cited to the court of appeals's opinion in *Combs*, 652 N.E.2d at 209, as "holding that post-conviction relief is not available by virtue of the doctrine of res judicata to address constitutional claims that could have been raised on direct appeal from the conviction and sentence." *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir.), *cert. denied*, --- U.S. ---, 119 S. Ct. 348 (1998).  *Norris* did not involve the issue of whether res judicata applies to bar a claim of ineffective assistance of trial counsel when one new co-counsel joins trial counsel in the appeal.  Although in *Norris* we relied on *Combs*'s explanation of the *Perry* rule, we did not express an opinion as to whether that rule was properly applied to the facts of the *Combs* case.

(naming Dr. Fisher's testimony first in connection with the purpose element).[17]

Defense counsel's failure to object to the use of Combs's "talk to my lawyer" statement was similarly damaging.  Just as Dr. Fisher's testimony partly relieved the State of its burden of proof on an element of the offense, the State strategically used Combs's protected silence as evidence that Combs was acting rationally, and thus with purpose and prior calculation, after the shootings; the trial court's instruction encouraged the jury to make that inference.

Of course, the State presented other evidence of Combs's purpose and prior calculation and design.  As the Ohio Supreme Court pointed out:

> Combs spent a considerable part of the afternoon of the murders searching for a shotgun.  He asked two people for a shotgun, and eventually drove over eighty miles before returning to Cincinnati with a shotgun.  The evidence indicates he stole the shotgun he used.  After he drove back to Cincinnati, he confronted Joan and Peggy and initiated a car chase over several blocks, eventually cornering them at the Holiday Park Tower office building.  He deliberately knocked out a window in their car and fired a shotgun into each woman's head at close range.  Those facts alone establish both purposefulness and prior calculation and design.

*Combs*, 581 N.E.2d at 1076.  However, Combs offered an alternative reason for his search for a gun; rather than spending the afternoon searching for the means to commit two murders, Combs suggested that he was searching for a means to kill himself.  There was evidence that Combs was contemplating suicide at the time.  One witness testified that Combs sounded suicidal just days before the incident, and another witness testified that just before the shootings, Combs

---

[17]As Combs points out, the district court acknowledged that Fisher's testimony was prejudicial.  J.A. at 132 (Dist. Ct. Op.).

*Strickland* instructed that "[p]revailing norms of practice as reflected in American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides." *Strickland*, 466 U.S. at 688. ABA Standard 4-1.2(c) states that "[s]ince the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should respond to this difference by making extraordinary efforts on behalf of the accused." ABA STANDARDS FOR CRIMINAL JUSTICE PROSECUTION FUNCTION AND DEFENSE FUNCTION 120 (3d ed. 1993).

### 5. Prejudice

In order to establish prejudice, Combs "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693. He must instead show that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt about his guilt.[16] *See id.* at 695. The defense theory was that Combs's intoxication rendered him unable to act with purpose or prior calculation and design, and yet defense counsel made two crucial errors that substantially undercut this theory. We conclude that each of these errors is sufficiently prejudicial to satisfy the *Strickland* standard.

Presentation of Dr. Fisher's testimony is perhaps the most devastating error. The testimony of the sole defense expert that Combs, although intoxicated, nevertheless acted with purpose and intent was obviously damaging to the defense. Furthermore, Dr. Fisher's testimony provided the State with its most powerful evidence of purpose. R. at 1226-27; J.A. at 2744-45 (State's Closing Argument at Culpability Phase)

---

[16]Guilt means guilt of the underlying offenses; Combs must therefore show not that a factfinder would have had a reasonable doubt about his culpability for the killings, but rather that a factfinder would have had a reasonable doubt about his purpose or prior calculation and design.

---

Cir.), *cert. denied*, --- U.S. ---, 119 S. Ct. 348 (1998).[5] The presumption of correctness accorded to state court findings "only applies to basic, primary facts, and not to mixed questions of law and fact," and it "applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *Groseclose v. Bell*, 130 F.3d 1161, 1164 (6th Cir. 1997) (quoting *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997)), *cert. denied*, 523 U.S. 1132 (1998).

### 1. The *Strickland* Standard

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The well-known two part test for evaluating ineffectiveness claims was first articulated in *Strickland*:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687; *see also, e.g., Tucker v. Prelesnik*, 181 F.3d 747, 754 (6th Cir. 1999); *Chandler v. Jones*, 813 F.2d 773, 781 (6th Cir. 1987).

---

[5]The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996), is inapplicable to this case because Combs filed his petition for a writ of habeas corpus in the district court before the enactment of the statute. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

With regard to the performance prong of the inquiry, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of performance is highly deferential, and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Therefore, this court should judge whether, in light of all the circumstances viewed at the time of counsel's conduct, counsel's "acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. Furthermore, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91; *see also Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984). Finally, when analyzing an attorney's performance, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that counsel rendered reasonable professional assistance." *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (quoting *Strickland*, 466 U.S. at 690).

As for the prejudice prong of the *Strickland* test, the Court instructed: "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Therefore, the prejudice inquiry must not focus solely on mere outcome determination; attention must be given to "whether the result

and would also have enabled counsel to respond to Zompero's allegedly inaccurate testimony.

Additionally, Combs's counsel made no attempt to redact portions of a videotaped testimony that may have been prejudicial to Combs. At trial, the videotaped testimony of Tony Liming, who was then fifteen years old, was presented by the prosecution.[14] Liming was with Combs when he obtained a gun on the day of the shootings; he also testified as to Combs's use of drugs and alcohol on a regular basis and on the day in question. At one point, Stidham asked Liming what his feelings toward Combs were. Liming answered: "He is, I guess I liked him, I mean I liked him. He like did stuff, stole stuff from my mom and I didn't like that." R. at 944; J.A. at 2631 (Tony Liming Test.). Combs argues that counsel should have sought to have this "highly prejudicial 'other acts'" evidence redacted prior to trial pursuant to Ohio Rule of Evidence 404(B),[15] and we agree. The statement is likely excludable under Rule 404(B); it does not go to any permissible purpose, and it might tend to leave the jury with an overall bad impression of Combs's character. Considering the potential prejudice from the statement, counsel clearly erred by failing to seek redaction.

Counsel's overall performance is particularly shocking given the fact that this case involves the death penalty.

---

have been cumulative.

[14] Liming was questioned on direct by Stidham.

[15] Ohio Rule of Evidence 404(B) reads: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OHIO R. EVID. 404(B) (Banks-Baldwin 1995).

The Ohio Supreme Court has instructed that Rule 404(B) "must be construed against admissibility, and the standard for determining admissibility of such evidence is strict." *Ohio v. Broom*, 533 N.E.2d 682, 686 syllabus para. 1 (Ohio 1988), *cert. denied*, 490 U.S. 1075 (1989).

establish one of the elements of its case in chief. Quite simply, this testimony was completely devastating to the defense, and counsel's decision to present it was objectively unreasonable.

### 4.    Defense Counsel's Overall Performance at the Culpability Phase

We next proceed to assess defense counsel's overall performance throughout the culpability phase of Combs's trial. We acknowledge that defense counsel presented significant evidence that Combs was intoxicated on the day of the shootings. However, the errors that we have identified are fundamental errors that were severely damaging to Combs's defense. In fact, we believe that each of the errors that we have identified is independently sufficient to warrant a conclusion that Combs's counsel's performance was constitutionally deficient. However, these errors were compounded by other failures on the part of defense counsel.

For example, Combs's counsel failed to investigate and to present available physical evidence of Combs's intoxication on the day of the shootings. Combs argues that, had defense counsel investigated this matter, they would have found out from his mother that "when [she] got the car back [from the police after their investigation] there were wine cooler bottles, and beer cans in the car" and that "[a] cooler in the back still contained two beers." J.A. at 1304 (Aff. of Geraldine Combs). At trial, Officer Zompero, who is a police criminalist, testified that he had conducted a search of Combs's car, but had not found any kind of container that would be used to hold alcohol such as a beer can, wine cooler can, or whiskey bottle. R. at 1081; J.A. at 2700 (Zompero Test.). Investigating the presence of alcohol containers in the car would have enabled defense counsel to present some corroborating physical evidence of Combs's intoxication,[13]

---

[13]Although defense counsel did present substantial testimonial evidence of Combs's intoxication, no corroborating physical evidence was presented. Therefore, the evidence of alcohol containers would not

of the proceeding was fundamentally unfair or unreliable." *Id.* at 369.

Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact entitled to de novo review. *See Strickland*, 466 U.S. at 698; *Groseclose*, 130 F.3d at 1164 ("An ineffective assistance of counsel claim presents a mixed question of law and fact, for which both the state-court and district-court determinations are subject to *de novo* review by this court.").

### 2.    Defense Counsel's Failure to Object to the Unconstitutional Use of Combs's "Talk to My Lawyer" Statement

Combs first claims that his trial counsel provided ineffective representation by failing to object both to the prosecution's use of a statement made by Combs to a police officer and to the trial court's sua sponte jury instruction concerning the purposes for which the jury could consider that statement.[6] As the Ohio Supreme Court found, after Combs had been shot Cincinnati police officer Douglas Ventre arrived on the scene and found Combs sitting on the ground and holding a shotgun. *See Combs*, 581 N.E.2d at 1074. Ventre then pulled the shotgun away from Combs and asked Combs what had happened, to which Combs replied "the guy shot me." *Id.* (internal quotation marks omitted). Ventre later repeated the same question as Combs was being placed into an ambulance, and Combs "told [Ventre] to talk to his lawyer." *Id.* (internal quotation marks omitted). After Officer Ventre testified about this "talk to my lawyer" statement, the trial court instructed:

Members of the jury, I am going to give you a special instruction at this time based upon the testimony that you heard the defendant Ronald Dean Combs has a constitutional right not to speak to members of law

---

[6]This claim was raised on direct appeal and denied. It was therefore properly preserved for our review.

enforcement without counsel and not to speak to them. You cannot draw any inferences for or against the defendant because he may have requested an attorney or made no further statements to Officer Ventre when he was on the stretcher as Officer Ventre testified to.

You may consider this evidence, however, as it relates to the elements of purpose and prior calculation and design but what weight you give to this testimony depends upon your findings and the weight that you attribute to this testimony in this regard so please remember that.

R. at 1052-53; J.A. at 2673-74.  Defense counsel did not object to this jury instruction, nor did they object to the prosecution's use of this statement at trial.  In closing argument, the prosecution stated:

Talk to my lawyer.  Talk to my lawyer.  Does that sound like someone who's so intoxicated he doesn't know what is going on?  Isn't that evidence that he realizes the gravity of the situation and at this time gave that particular comment or response to Officer Ventre?

R. at 1255; J.A. at 2761.  Combs argues that "the trial court's instruction permitted, and the prosecution exploited, Mr. Combs' exercise of his right to consult with counsel as substantive evidence on the ultimate culpability phase issue — Mr. Combs' intent."  Pet'r Br. at 18.

In order to decide whether counsel's failure to object to the use of the "talk to my lawyer" statement was deficient, we must first determine whether the use of this statement was constitutionally defective such that any reasonable counsel would have objected under the circumstances.  Although Combs's statement referred not to silence but to his right to an attorney, the admissibility of the statement is properly analyzed as a comment on prearrest silence.  *See Wainwright v. Greenfield*, 474 U.S. 284, 295 n.13 (1986) ("With respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a

such as Combs's state of despondency, his difficult past, his history of severe drug and alcohol abuse, and his stormy relationship with Peggy Schoonover.  R. at 1176-78; J.A. at 2579-81 (Fisher Test.).  Additionally, Fisher supported the contention that Combs was under the influence when he shot the victims.  However, Stidham testified that defense counsel put Fisher on the stand in an effort "to establish that Combs could not act purposely and intentionally because of his diminished capacity," and Stidham admitted that he was "surprised" when Fisher testified to the opposite.  J.A. at 2920 (Stidham Dep.).  Fisher's opinion regarding whether Combs lacked the requisite intent to commit the crimes was crucial to the defense theory; defense counsel's failure to have questioned Fisher in this regard prior to trial is inexcusable.  Defense counsel should have known Fisher's opinion on this ultimate issue and should have prepared accordingly.

Regardless of whether Combs's counsel should have known or instead actually knew Fisher's opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable.  In Ohio, evidence of voluntary intoxication "may be considered in determining whether an act was done intentionally or with deliberation or premeditation."  *Ohio v. Fox*, 428 N.E.2d 410, 412 (Ohio 1981).  Thus, establishing that a defendant was intoxicated when he committed the crime in question is not, in and of itself, helpful; the evidence must also lead the factfinder to an inference that intoxication deprived the defendant of the ability to form intent.  Indeed, Stidham testified that the defense presented Fisher in order to establish that Combs could not have been acting purposefully.  Fisher's testimony directly contradicted the sole defense theory that Combs lacked the requisite intent to commit murder.  Although defense counsel presented substantial testimonial evidence that Combs was in fact intoxicated at the time of the shootings, this testimony was rendered worthless when the defense's own expert testified that Combs's intoxication did not legally excuse his crime.  Furthermore, not only did Fisher's testimony destroy any hope of a successful intoxication defense, but it also helped the prosecution to

was impaired by what was happening to him and what he was ingesting." R. at 1187; J.A. at 2590 (Fisher Test.). On re-cross, however, Dr. Fisher gave the same testimony regarding intent:

> Q.  But, Doctor, was it so impaired that he could not — wasn't so impaired that he could not form this intent?
>
> A.  That is correct, yes.

R. at 1188; J.A. at 2591 (Fisher Test.). The prosecutor then emphasized Dr. Fisher's testimony regarding intent three times in closing arguments.[12] Combs argues that counsel's failure to anticipate, suppress, prepare for, object to, or avoid repetition of this damaging testimony rendered his performance constitutionally deficient.

Although Combs's counsel's decision to present Dr. Fisher's testimony may be considered a strategic one, it was a decision made without undertaking a full investigation. *Cf. Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."), *cert. denied*, 503 U.S. 952 (1992). At trial, Dr. Fisher did present several aspects of Combs's history that were psychologically relevant,

---

[12]Combs's counsel chose to put Dr. Fisher on the stand again at the sentencing phase, and Dr. Fisher testified, this time on direct, that Combs acted with intent. Dr. Fisher stated: "Well, it is my opinion that a person with Mr. Combs' exact history of drug and alcohol abuse, drug and alcohol ingestion, and treatment would still be able to control ordinary behaviors, plan behavior in a purposeful way, carry out behavior in a purposeful way. I think his judgment would have been a continuated [sic] to an extent and I think that one would see perhaps a greater degree of impulsivity in his behavior but I think that the basic issue of control would still be intact with his history." R. at 1385; J.A. at 2598 (Fisher Test.).

desire to remain silent as well as of a desire to remain silent until an attorney has been consulted."). Combs's statement is best understood as communicating a desire to remain silent outside the presence of an attorney.

Combs grounds his argument about the admissibility of the statement in the Supreme Court's decision in *Doyle v. Ohio*, 426 U.S. 610 (1976). In *Doyle*, the petitioner took the stand at his trial for selling marijuana and explained, for the first time, that he had been framed. *See id.* at 612-13. For impeachment purposes, the prosecutor asked the petitioner why he had not told this story immediately after his arrest. *See id.* at 613. The petitioner was convicted, and he appealed on the ground that cross-examination regarding his post-arrest silence was error. *See id.* at 615. The Supreme Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619. The theory underlying *Doyle* is that while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings." *Id.* at 618. On this reasoning, the Court concluded that it would be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *See id.*

Later cases have restricted *Doyle* and have reaffirmed that the "fundamental unfairness" identified by the Court derives from the implicit assurances of the *Miranda* warnings. In *Jenkins v. Anderson*, 447 U.S. 231 (1980), the Court held that due process is not violated by the impeachment use of prearrest, pre-*Miranda* warnings silence, *see id.* at 238-39. In *Fletcher v. Weir*, 455 U.S. 603 (1982), the Court held that impeachment use of post-arrest, pre-*Miranda* warnings silence does not offend due process, *see id.* at 607. The *Weir* Court explained that *Doyle* was a case in which the government had actually induced silence with *Miranda*

warnings, and it noted that any broadening of *Doyle* to a situation in which a defendant had not yet received *Miranda* warnings — even if the defendant was in custody — was unsupported by the reasoning of *Doyle*. *See id.* at 605-06.

In the instant case, Combs had not received *Miranda* warnings prior to his "talk to my lawyer" statement. The Ohio Supreme Court concluded that this was of no significance based on the following reasoning:

> [A]t the point when Combs was placed in the ambulance, we find that Combs was in custody and had a right to remain silent, consult a lawyer, and receive a *Miranda* warning. When he arrived at the scene, Officer Ventre personally took the shotgun from Combs; there were two women dead from shotgun blasts in the adjacent car; and Ventre had been at the scene for some ten to fifteen minutes. Ventre's questioning, without a *Miranda* warning, violated those rights.

*Combs*, 581 N.E.2d at 1075-76. However, even if Combs should have received *Miranda* warnings prior to his "talk to my lawyer" statement, the *Doyle* rationale is still inapplicable. As we have explained, the *Doyle* line of cases clearly rests on the theory that *Miranda* warnings themselves carry an implicit assurance that silence will not be penalized; actual receipt of the warnings is key. Therefore, the comment on Combs's pre-*Miranda* silence did not violate due process.

This does not, however, rule out the possibility that such comment is a violation of Combs's Fifth Amendment privilege against self-incrimination.[7] In *Jenkins*, in addition to ruling that impeachment use of a defendant's prearrest silence is not violative of due process, the Court also held that such use does not offend the Fifth Amendment's privilege against self-incrimination. *See Jenkins*, 447 U.S. at 238. The

---

[7]The Fifth Amendment provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.

---

culpability phase regarding Combs's drug and alcohol abuse and his intoxication on the day of the events; on cross-examination, Dr. Fisher expressed the opinion that, although intoxicated, Combs acted purposefully and intentionally. Defense counsel objected to the prosecutor's question, but the objection was overruled. The exchange on cross proceeded as follows:

> Q.  Dr. Fisher, you have rendered an opinion that at the time, July 15th, the defendant was under the influence, is that correct?
>
> A.  That's my opinion, yes.
>
> Q.  You are not however saying that the acts he did on that particular day were not done purposely?
>
> MR. STIDHAM: Objection.
>
> THE COURT:    Overruled.
>
> A.  I certainly am not, no.
>
> Q.  So he may have been under the influence or your opinion based on what you were told he was under the influence but at the same time he was acting intentionally and purposely when he acted as he did on July 15th; is that correct?
>
> MR. STIDHAM: Objection.
>
> THE COURT:    Overruled.
>
> A.  I certainly believe that he was, yes.

R. at 1183; J.A. at 2586 (Fisher Test.).

On redirect, defense counsel again attempted to show that intoxication has an effect on one's ability to make judgments. Defense counsel elicited Dr. Fisher's testimony that "it would be my conclusion psychologically that [Combs's] judgment

**(B)  Exclusion discretionary.**

Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.

OHIO R. EVID. 403.  The Ohio Supreme Court concluded that the comments regarding the "talk to my lawyer" statement were improper under these rules, stating:

Additionally, the "talk to my lawyer" evidence does not relate to or tend to prove prior calculation and design or purposefulness.  Combs' comment simply meant that he was exercising his right to counsel and nothing more. Even if this remark was initially admissible, Evid.R. 401 and 403 would otherwise invite exclusion from evidence. No justification is apparent for the instruction that the evidence related to either purposefulness or prior calculation and design.  Thus, we conclude the trial court erred in allowing this remark into evidence and in instructing the jury to consider the remark in relation to purposefulness and prior calculation and design.

*Combs*, 581 N.E.2d at 1076.

A reasonable defense attorney would have known that the admission of the "talk to my lawyer" statement was prejudicial to the client and would have objected on the basis of Rule 403.  Such an objection would have had at least a likelihood of success, given the Ohio Supreme Court's pronouncement on this issue.  A Rule 403 objection to Officer Ventre's testimony could have prevented the erroneous instruction as well as the damaging use of the statement by the prosecution.

### 3.  Defense Counsel's Presentation of Dr. Fisher's Testimony

Combs next alleges ineffectiveness as a result of counsel's preparation of and strategy with regard to Dr. Fisher, the defense's only expert witness.  Dr. Fisher testified at the

petitioner in that case took the stand at his murder trial and testified that he had killed in self-defense.  *See id.* at 232. During cross-examination and again during closing arguments, the prosecutor, referring to the fact that the petitioner had waited two weeks to report the stabbing, attempted to impeach the petitioner's credibility by implying that he would have come forward earlier if he had truly killed in self-defense.  *See id.* at 233-34.  The Supreme Court easily disposed of the petitioner's Fifth Amendment objection to this use of his prearrest silence, relying on its 1926 decision in *Raffel v. United States*, 271 U.S. 494 (1926).  *Raffel* held that the government may impeach a defendant who takes the stand in his own defense with his prior silence without violating the Fifth Amendment.  *See id.* at 499.  The Court in *Raffel* relied on a waiver theory, reasoning that a defendant waives his Fifth Amendment immunity from giving testimony by offering himself as a witness.  *See id.* at 496-97.  The *Raffel* Court concluded by explaining:

The safeguards against self-incrimination are for the benefit of those who do not wish to become witnesses in their own behalf and not for those who do.  There is a sound policy in requiring the accused who offers himself as a witness to do so without reservation, as does any other witness.  We can discern nothing in the policy of the law against self-incrimination which would require the extension of immunity to any trial or to any tribunal other than that in which the defendant preserves it by refusing to testify.

*Id.* at 499.  The *Jenkins* Court therefore reasoned that the rule of *Raffel* permits impeachment use of prearrest silence.

The *Jenkins* Court went on to explain that permitting the impeachment use of a defendant's prior silence does not unconstitutionally burden the exercise of Fifth Amendment rights.  *See Jenkins*, 447 U.S. at 236-38.  The Court noted that the "'threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.'"  *Id.* at 236 (quoting *Chaffin v. Stynchcombe*,

412 U.S. 17, 32 (1973)).  Relying on prior decisions, the *Jenkins* Court reasoned that the possibility of impeachment by prior silence does not impermissibly burden the privilege against self-incrimination.  *See id.* at 236-38.  These prior decisions suggested that a defendant's real dilemma lies in determining whether to testify or not; once a defendant has voluntarily taken the stand, the rule that he must testify fully does not significantly add to this dilemma and is indeed a defendant's obligation, as the privilege against self-incrimination "cannot be construed to include the right to commit perjury."  *Id.* at 238 (quoting *Harris v. New York*, 401 U.S. 222, 225 (1971)).  The Court then explained that "[i]n determining whether a constitutional right has been burdened impermissibly, it also is appropriate to consider the legitimacy of the challenged governmental practice."  *Id.* at 238.  The Court reasoned that the impeachment use of prearrest silence "enhance[s] the reliability of the criminal process" by giving prosecutors the chance to test a defendant's credibility by asking him to explain prior inconsistencies.  *Id.*  "Once a defendant decides to testify, '[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination.'"  *Id.* (quoting *Brown v. United States*, 356 U.S. 148, 156 (1958)) (alteration in original).

*Jenkins* did not, however, address the question at issue in this case, namely, whether the use of prearrest silence as substantive evidence of guilt violates the Fifth Amendment.  *See id.* at 236 n.2 (leaving this question unresolved).  That use of a defendant's prearrest silence as substantive evidence of guilt is significantly different than the use of prearrest silence to impeach a defendant's credibility on the stand is clear.  In *Griffin v. California*, 380 U.S. 609, 615 (1965), the Supreme Court held that the Fifth Amendment "forbids either comment by the prosecution on the accused's [refusal to testify at trial] or instructions by the court that such silence is evidence of guilt."  The Court reasoned that a contrary rule would allow the state to submit as substantive proof of the defendant's

lodged an objection on that basis.  Counsel's failure to have objected at any point is inexplicable, and we can perceive no possible strategic reason for such failure.[11]  Not only did the failure to object ensure that the jury could use Combs's protected silence against him, but it also guaranteed that both the admission of the statement and the trial court's instruction would be analyzed on review only for plain error.  Counsel's performance with respect to this issue was constitutionally deficient under the *Strickland* standard.

Even if Combs's counsel failed to realize that use of the "talk to my lawyer" statement as substantive evidence of guilt might be unconstitutional, counsel still should have objected to the statement on evidentiary grounds.  Ohio Rule of Evidence 401 provides the definition of "relevant evidence": "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  OHIO R. EVID. 401.  Rule 403 provides:

**(A)  Exclusion mandatory.**
   Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

---

astounded us that we were shocked."  J.A. at 2928 (Stidham Dep.).

[11]The State argues that the trial court's sua sponte instruction following Officer Ventre's testimony "limited any speculative damage to Combs," so that defense counsel's failure to object was a sound strategic decision designed not to draw any more attention to the matter.  Appellee's Br. at 52.  However, far from limiting the damage caused by the admission of the statement, the trial court's instruction exacerbated it.  The instruction encouraged the jury to use Combs's prearrest silence as substantive evidence of purpose and prior calculation and design — the key issues at trial.

for impeachment purposes, the use of silence as substantive evidence of guilt does not enhance the reliability of the criminal process.  Just as "every post-arrest silence is insolubly ambiguous," *Doyle*, 426 U.S. at 617, there are many reasons why a defendant may remain silent before arrest, such as a knowledge of his *Miranda* rights or a fear that his story may not be believed.  The probative value of such silence is therefore minimal.  Furthermore, the use of prearrest silence may even subvert the truthfinding process; because it pressures the defendant to explain himself or to suffer a court-sanctioned inference of guilt, the likelihood of perjury is increased.  In sum, permitting the use of a defendant's prearrest silence as substantive evidence of guilt would greatly undermine the policies behind the privilege against self-incrimination while adding virtually nothing to the reliability of the criminal process.

In the instant case, Combs clearly invoked the privilege against self-incrimination by telling the officer to talk to his lawyer, thus conveying his desire to remain silent without a lawyer present.  Combs never waived this privilege and did not testify at his trial.  Therefore, the prosecutor's comment on Combs's prearrest silence in its case in chief and the trial court's instruction permitting the jury to use Combs's silence as substantive evidence of guilt violated Combs's Fifth Amendment rights.

Defense counsel's failure to object to the unconstitutional use of Combs's "talk to my lawyer statement" clearly fell below an objective standard of reasonableness.  Although the contours of the privilege against self-incrimination may sometimes be unclear, that a defendant's silence cannot be used as substantive evidence against him at trial is a fundamental aspect of the privilege.  Combs's counsel should have realized that the use of Combs's prearrest silence against him was at least constitutionally suspect[10] and should have

---

[10]In fact, it appears that Combs's counsel did realize the problems surrounding the use of the "talk to my lawyer" statement.  Stidham testified in a deposition that the trial court's instruction on the issue "so

guilt his silence by not testifying.  *See id.* at 613 ("No formal offer of proof is made as in other situations; but the prosecutor's comment and the court's acquiescence are the equivalent of an offer of evidence and its acceptance.").  Such proffer of the defendant's refusal to testify as evidence of guilt would impermissibly penalize the exercise of the privilege against self-incrimination and would "cut[] down on the privilege by making its assertion costly."  *Id.* at 614.

The circuits that have considered whether the government may comment on a defendant's prearrest silence in its case in chief are equally divided.  Three circuits have held that such use violates the privilege against self-incrimination found in the Fifth Amendment, relying principally upon *Griffin*.  *See United States* ex rel. *Savory v. Lane*, 832 F.2d 1011, 1017 (7th Cir. 1987); *Coppola v. Powell*, 878 F.2d 1562, 1568 (1st Cir.), *cert. denied*, 493 U.S. 969 (1989); *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991), *cert. denied*, 503 U.S. 997 (1992); *cf. United States v. Caro*, 637 F.2d 869, 876 (2d Cir. 1981) ("Whatever the future impact of *Jenkins* may be, we have found no decision permitting the use of silence, even the silence of a suspect who has been given no *Miranda* warnings and is entitled to none, as part of the Government's direct case."; "[W]e are not confident that *Jenkins* permits even evidence that a suspect remained silent before he was arrested or taken into custody to be used in the Government's case in chief.").  In *Savory*, the Seventh Circuit explained that because the defendant did not take the stand and because the prosecution referred to the defendant's silence as substantive evidence of guilt, the case did not involve the application of *Doyle* but rather the application of *Griffin*.  *See Savory*, 832 F.2d at 1017.  The Seventh Circuit reasoned that while *Griffin* involved governmental use of the defendant's silence at trial, "[t]he right to remain silent, unlike the right to counsel, attaches before the institution of formal adversary proceedings."  *Id.* at 1017.  The court therefore concluded that *Griffin*'s prohibition on the use of a defendant's silence as substantive evidence of guilt "applies equally to a defendant's silence before trial, and indeed, even

before arrest." *Id.*[8]  In *Coppola*, the First Circuit cited *Raffel* and *Griffin* and reasoned that the "broad rule of law" set forth in those cases "is that where a defendant does not testify at trial it is impermissible to refer to any fifth amendment rights that defendant has exercised." *Coppola*, 878 F.2d at 1567.  It therefore held that the prosecution's use of the defendant's prearrest silence in its case in chief violated the Fifth Amendment. *See id.* at 1568.  The Tenth Circuit reached the same result in *Burson*: "The general rule of law is that once a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised.  To be sure, exceptions exist to this rule, such as the use of silence for impeachment in certain circumstances, but such exceptions have no applicability to the case before us."  952 F.2d at 1201 (citation omitted).

Three circuits, on the other hand, have reached the opposite conclusion. *See United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991); *United States v. Zanabria*, 74 F.3d 590, 593 (5th Cir. 1996); *United States v. Oplinger*, 150 F.3d 1061, 1066-67 (9th Cir. 1998).  In *Rivera*, the Eleventh Circuit, citing *Jenkins*, held that "[t]he government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings." *Rivera*, 944 F.2d at 1568.  Although the defendant raised only a due process challenge to the use of her prearrest silence, the Eleventh Circuit found no constitutional infirmity with the use of that

---

[8]The Seventh Circuit distinguished the *Doyle* line of cases as follows:

[T]he *Doyle* rule is predicated on the implied promise of the *Miranda* warnings. The cases which have allowed impeachment by silence rely on the fact that the defendant opens himself to impeachment by taking the stand.  There is, on the other hand, a constitutional right to say nothing at all about the allegations. While the presence of *Miranda* warnings might provide an additional reason for disallowing use of the defendant's silence as evidence of guilt, they are not a necessary condition to such a prohibition.

*Savory*, 832 F.2d at 1017-18 (citations omitted).

inhumane treatment and abuses; our sense of fair play which dictates "a fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load"; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life"; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent."

*Id.* at 55 (citations omitted).  As the *Jenkins* Court recognized, when the government uses a defendant's prearrest silence for purposes of impeachment, these policies are largely not implicated; every defendant is already under some pressure to testify fully so that the jury does not draw an unfavorable inference from his silence (or partial silence), and a rule permitting a defendant to be impeached on the stand with prior silence does not add substantially to this pressure. If, on the other hand, prearrest silence may be used as substantive evidence of guilt regardless of whether or not the defendant testifies at trial, then the defendant is cast into the very trilemma outlined by the *Murphy* Court.  Because in the case of substantive use a defendant cannot avoid the introduction of his past silence by refusing to testify, the defendant is under substantial pressure to waive the privilege against self-incrimination either upon first contact with police or later at trial in order to explain the prior silence.  Perhaps most importantly, use of a defendant's prearrest silence as substantive evidence of guilt substantially impairs the "sense of fair play" underlying the privilege.  Unlike in the case of impeachment use, the use of a defendant's prior silence as substantive evidence of guilt actually lessens the prosecution's burden of proving each element of the crime.

We also conclude that the government's use of a defendant's prearrest silence in its case in chief is not a legitimate governmental practice.  Unlike the use of silence

[individual's] position would have understood the situation.'" (quoting *Berkemer*, 468 U.S. at 442) (alteration in original)). Applying that standard to the facts of this case leads to a conclusion that Combs was in custody when Officer Ventre asked him for the second time what had happened. Although *Miranda* warnings are not required prior to routine questioning when officers have no details concerning what happened when they arrive on the scene, *see United States v. Wolak*, 923 F.2d 1193, 1196 (6th Cir.), *cert. denied*, 501 U.S. 1217 (1991), the instant case presents a different situation. Ventre personally took the shotgun away from Combs; he testified that he "pointed [his] weapon at the subject on the ground and ordered him to drop the shotgun" and that he "ordered him several times to drop the shotgun and [Combs] started raising the shotgun toward me." R. at 1042; J.A. at 2670 (Ventre Test.). In addition, ten or fifteen minutes passed from the time Ventre arrived on the scene until the second question. In that time, other officers had arrived and Ventre would surely have had some details about the incident. A reasonable person in Combs's situation could have believed that he was under arrest, and we therefore conclude that Combs was in custody.

Having decided that the privilege against self-incrimination applies to a prearrest situation, an analysis such as the one employed by the Court in *Jenkins* leads us to the conclusion that the use of prearrest silence as substantive evidence of guilt is an impermissible burden upon the exercise of that privilege. First, permitting the use of silence in the government's case in chief would substantially impair the policies behind the privilege. The Supreme Court in *Murphy v. Waterfront Commission*, 378 U.S. 52 (1964), explained:

[The privilege against self-incrimination] reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by

silence in the government's case in chief. *See id.* The Fifth Circuit in *Zanabria* held, without citing any cases, that the Fifth Amendment did not protect the defendant's prearrest silence because the silence at issue was not induced by the government. *See Zanabria*, 74 F.3d at 593. The court explained: "The fifth amendment protects against compelled self-incrimination but does not, as Zanabria suggests, preclude the proper evidentiary use and prosecutorial comment about *every* communication or *lack* thereof by the defendant which may give rise to an incriminating inference." *Id.* Most recently, the Ninth Circuit joined the Fifth and Eleventh Circuits in holding that the use of a defendant's prearrest silence as substantive evidence of guilt does not violate the Fifth Amendment. *See Oplinger*, 150 F.3d at 1067. The Ninth Circuit, following the reasoning of Justice Stevens's concurring opinion in *Jenkins*, explained that "the privilege against compulsory self-incrimination is irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak." *Id.* at 1066.

We agree with the reasoning expressed in the opinions of the Seventh, First, and Tenth Circuits, and today we join those circuits in holding that the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination. Like those circuits, we believe "that application of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime." *Coppola*, 878 F.2d at 1565. The Supreme Court has given the privilege against self-incrimination a broad scope, explaining that "[i]t can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 444-45 (1972) (footnote omitted); *see also Hoffman v. United States*, 341 U.S. 479, 486 (1951) ("[The privilege] must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer.");

*Hoffman*, 341 U.S. at 486-87 ("To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result."). In a prearrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution; the privilege should thus apply.

Furthermore, we note that even under the reasoning of Justice Stevens in his *Jenkins* concurrence, the Fifth Amendment would apply to Combs's situation. In *Jenkins*, Justice Stevens agreed with the majority that the Fifth Amendment was inapplicable to the petitioner's claim, but Justice Stevens objected to the majority's reliance on the waiver theory of *Raffel*. *See Jenkins*, 447 U.S. at 241 (Stevens, J., concurring in the judgment). Instead, Justice Stevens would have ruled that the Fifth Amendment does not apply to a precustody context: "When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent." *Id.* at 243-44 (footnote omitted).

Even assuming that the Fifth Amendment is inapplicable to precustody contexts,[9] the privilege would still be applicable

---

[9]We stress that we do not believe that the Fifth Amendment comes into play only when a defendant is taken into custody, for it would eviscerate the privilege to say that, although a defendant's post-custody silence may not be used as substantive evidence against him, a defendant's precustody silence may. As Justice Marshall explained in his *Jenkins* dissent:

I confess I find MR. JUSTICE STEVENS' view of the Fifth Amendment incomprehensible. Apparently, under that view, a person's right not to incriminate himself exists only if the

to Combs, for we agree with the Ohio Supreme Court's finding that Combs was in custody at the time he made the "talk to my lawyer" statement. In *Stansbury v. California*, 511 U.S. 318 (1994), the Supreme Court explained that "[i]n determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" *Id.* at 322 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (alteration in original). Moreover, in the custody determination, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 324 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)); *see also United States v. Ozuna*, 170 F.3d 654, 658 (6th Cir. 1999) ("Determination of whether an individual is in custody for purposes of applying the *Miranda* doctrine considers 'how a reasonable man in the

---

government has already attempted to compel him to do so. If no officials have tried to get the person to speak, he evidently has a duty to incriminate himself, because the reporting of crime is a civic duty and the Fifth Amendment is not applicable since the decision to speak or remain silent is, at that time, "voluntary."

But the prohibition against compelled self-incrimination is another way of expressing the right not to incriminate oneself. After all, the only means of compelling a person to incriminate himself is to penalize him if he does not. Of course the voluntary decision to remain silent in the absence of any official compulsion does not "raise any issue under the Fifth Amendment," since there has been no self-incrimination at all. A voluntary decision to speak also does not implicate the Fifth Amendment because the self-incrimination was not compelled. But to impose a duty to report one's own crime before an official accusation has been made would itself be to compel self-incrimination, thus bringing the Fifth Amendment into play. And, as *Griffin v. California* makes plain, the Constitution also prohibits the government from burdening the right not to incriminate oneself by penalizing silence. In the present case the violation of the Fifth Amendment occurred not when the defendant remained silent, but when that silence was later used against him at his criminal trial.

*Jenkins*, 447 U.S. at 250 n.4 (Marshall, J., dissenting) (citations omitted).