**Chamar AVERY, Petitioner,**

v.

**John PRELESNIK, Respondent.**

No. 1:04–CV–289.

United States District Court,
W.D. Michigan,
Southern Division.

Nov. 8, 2007.

Chari K. Grove, Michigan Appellate Defender, Detroit, MI, for Petitioner.

Brenda E. Turner, Debra M. Gagliardi, Michigan Dept. Attorney General, Lansing, MI, for Respondent.

## *OPINION*

RICHARD ALAN ENSLEN, Senior District Judge.

This matter is before the Court on Respondent John Prelesnik's Objections to United States Magistrate Judge Ellen S. Carmody's Report and Recommendation of August 20, 2007, which recommended granting Petitioner Chamar Avery's habeas petition on one claim. Also before the Court are Petitioner's Objections to the Report, which recommended denying Petitioner's habeas petition on another claim. This Court reviews the Objections, the Report, and pertinent portions of the record *de novo* pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below and in the Report, the Court finds all Objections to be without merit.

## I. BACKGROUND

On January 15, 2000, between 7:30 p.m. and 8:00 p.m., Geoffrey Stanka was robbed and killed while attempting to deliver pizza. Petitioner and two other individuals were implicated in this crime, one of whom was tried with Petitioner as a co-defendant, although each had a separate jury. Petitioner was charged with first degree

felony murder and possession of a firearm during the commission of a felony. Following a jury trial in 2000, Petitioner was acquitted of those charges but convicted of second degree murder. Petitioner was sentenced to 20 to 50 years in prison.

Petitioner appealed to the Michigan Court of Appeals, who remanded the matter for a *Ginther*[1] hearing on his ineffective assistance of counsel claims. Upon concluding the *Ginther* hearing, the Michigan trial court denied Petitioner's claims. Petitioner then filed a supplemental brief in the Michigan Court of Appeals alleging, *inter alia*, that he was denied effective assistance of counsel by his trial attorney's failure to present an alibi defense or produce alibi witnesses at trial. The Michigan Court of Appeals affirmed Petitioner's conviction. The Michigan Supreme Court thereafter denied Petitioner's motion for leave to appeal.

Petitioner filed the present Petition for Writ of Habeas Corpus on April 26, 2004 on the following claims:

> I. Petitioner was denied his right to the effective assistance of counsel because of his trial attorney's failure to investigate, contact and interview Petitioner's alibi witnesses, and his failure to produce them at trial.
>
> II. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to object to hearsay testimony before Avery's jury which was only admissible as to Petitioner's co-defendant.

## II. LEGAL STANDARDS

Habeas relief, since 1996, has been limited by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2241 *et seq.*, which provisions are applicable to this case.

AEDPA provides in pertinent part that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As reflected in the statutory language, there are three avenues for habeas relief: (1) for decisions "contrary" to federal law; (2) for an "unreasonable application" of federal law; and (3) for an "unreasonable determination of the facts." *Id.* Under the caselaw of the United States Supreme Court and the Sixth Circuit Court of Appeals, a state court decision is "contrary to" federal law only when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Biros v. Bagley,* 422 F.3d 379, 386 (6th Cir.2005) (following *Williams* ). A state court decision is an "unreasonable application" of federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the

---

1. *People v. Ginther,* 390 Mich. 436, 212 N.W.2d 922 (1973).

prisoner's case." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495.

Factual findings made by the state court, or by state appellate courts based upon the trial record, are presumed to be correct but may be rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Biros*, 422 F.3d at 386; *Bugh v. Mitchell*, 329 F.3d 496, 500 (6th Cir. 2003). If a state court has failed to review a particular claim, AEDPA's deferential standard does not apply so courts must conduct a *de novo* review. *See McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir.2003).

## III. ANALYSIS

### A. Failure to Investigate Claim

The Report concluded that the decision of the Michigan Court of Appeals, denying Petitioner's ineffective assistance of counsel claim based on a failure to investigate, represents an unreasonable application of clearly established Supreme Court authority. Respondent argues that the Magistrate Judge improperly substituted her judgment for that of the Michigan courts and that Petitioner's trial attorney was justified in not pursuing an alibi defense. The Court finds Respondent's arguments to be without merit.

The Supreme Court's landmark decision in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), qualifies as "clearly established federal law" under 28 U.S.C. § 2254(d). *See Williams*, 529 U.S. at 391, 120 S.Ct. 1495. Thus, if Petitioner can show that the Michigan courts adjudicated his failure to investigate claim in a manner contrary to *Strickland*, he is entitled to habeas relief. To be successful on an ineffective assistance of counsel claim, *Strickland* requires that two elements be proven. First, a petitioner must demonstrate that his attorney's performance was deficient. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *see also Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir.2000) (holding that judicial scrutiny of attorney performance must be "highly deferential"). To prove a deficiency, a petitioner must show that his attorney's conduct fell "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. To satisfy *Strickland's* second element, a petitioner must show prejudice resulting from his attorney's deficient performance, meaning that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*

#### 1. Deficient Performance

■ Regarding the first prong of the *Strickland* Test, an attorney's performance is deemed deficient if the attorney fails to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Id.* at 691, 104 S.Ct. 2052. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* Thus, the "relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores–Ortega*, 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (citing *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052).

■ In this case, Petitioner told his trial attorney, David Lankford, that he could not have committed the murder. (Hr. Tr. 27, Nov. 2, 2001.) Petitioner's purported alibi was that he was 30 minutes away from the scene of the murder at the time it occurred waiting on his car to be repaired at Crimes Towing and Auto Shop. (*Id.*) Petitioner provided Lankford with the

names of three witnesses who could attest to his whereabouts on January 15: John Crimes Sr., LaVelle Crimes, and Damar Crimes. (Hr. Tr. 22–23, Sept. 7, 2001.) Petitioner also provided the business address of Crimes Towing and told Lankford that he could contact the three individuals there. (*Id.*) Petitioner showed Lankford a receipt from Crimes Towing, dated January 15, further corroborating his story. (*Id.* at 25–26.)

According to Lankford's *Ginther* hearing testimony,[2] he thereafter sent an investigator to Crimes Towing. (*Id.* at 23, 27.) The investigator spoke only with LaVelle Crimes, who stated that Petitioner left Crimes Towing sometime in the "mid-afternoon" of January 15 with LaVelle's brother, Damar Crimes. (*Id.* at 24–27.) LaVelle told the investigator that the pair "went to Damion's house on Ardmore [Street]" and returned to Crimes Towing around 9:15 p.m. or 9:30 p.m. (*Id.* at 24–25.) The investigator did not ask LaVelle, or anyone else for that matter, if he had contact information for Damion or Damar. (*See id.* at 29–33.) Lankford believes that the investigator left his card with someone at Crimes Towing "with the request that Damar and/or Damion contact us," but does not know this for certain. (*Id.* at 26–27, 29.)

As he was preparing Petitioner's case for trial, Lankford came to believe the prosecution had a weak case and that an alibi would bolster Petitioner's chances of acquittal. (*Id.* at 39–40, 43.) Based on this, Lankford instructed his investigator to again attempt to contact the individuals identified by Petitioner as well as visit Crimes Towing one more time. (*Id.* at 26–

28.) It is unknown to Lankford whether the investigator complied with this request. (*Id.*) Lankford never contacted any of the individuals on his own or went to Crimes Towing. (*Id.* at 31.)

Damar Crimes' testimony at the *Ginther* hearing revealed that he went to Crimes Towing every day and never received a telephone call or home visit from Lankford or his investigator. (Hr. Tr. 34, Sept. 28, 2001.) Testimony revealed that Damar's father told him that an investigator stopped by Crimes Towing, but Damar never received a business card from the investigator. (*Id.* at 13–14.) Instead, Petitioner's sister gave Damar a hand-written piece of paper with Lankford's number on it. (*Id.* at 14.) Damar tried to call the number; however, he testified that it was a wrong number. (*Id.*) According to Damar, he was never contacted by Lankford or his investigator. (*See id.* at 13–14.) Further, had he been called at trial, he would have provided an alibi for Petitioner during the evening of January 15, including between 7:30 p.m. and 8:00 p.m., in that he was with Darius Boyd (Damion's Brother) and Petitioner at a location 30 minutes away from the murder scene. (*Id.* 9–11.)

When Darius Boyd[3] testified at the *Ginther* hearing, he corroborated Damar's and Petitioner's account of what took place on January 15, lending further support to Petitioner's alibi defense. (Hr. Tr. 8–9, Nov. 2, 2001.) Darius also indicated that he was never contacted by Lankford or his investigator. (*Id.* at 10; Hr. Tr. 10, Sept. 28, 2001.)

---

**2.** Lankford's investigator did not testify at the *Ginther* hearing.

**3.** In retrospect, it appears from the record that Damion was not with Petitioner during the night of January 15, as suggested by La-

Velle. (*Id.* at 22.) Instead, Petitioner was with Darius. (*Id.*) Upon speaking to Damion or Damar, however, the investigator would have discovered this. (*See* Hr. Tr. 13, Nov. 2, 2001.)

Lankford never indicated to Petitioner that he was having trouble contacting witnesses. (Hr. Tr. 24, Nov. 2, 2001.) Instead, Petitioner testified that Lankford told him that "he didn't think they was [sic] good enough to use and then he said when we got to trial he said he don't [sic] think we need 'em [sic], cause [sic] they didn't have a case against me." (*Id.*) Lankford argues that he made a reasonable strategic decision to not place Damar or Darius on the witness stand because he was unsure what they "would say or how they would present." (Hr. Tr. 32, Sept. 7, 2001.)

▇ "Constitutionally effective counsel must develop trial strategy in the true sense—not what bears a false label of 'strategy'—based on what investigation reveals witnesses will actually testify to, not based on what counsel guesses they might say in the absence of a full investigation." *See Ramonez v. Berghuis,* 490 F.3d 482, 489 (6th Cir.2007). The Michigan Court of Appeals held that Lankford "made a valid strategical decision not to present such a defense because the information he obtained did not provide defendant with an alibi for the time of the crime." *People v. Avery,* No. 229324, 2002 WL 31264726, at *1 (Mich.Ct.App. Oct.8, 2002). In so stating, the Michigan Court of Appeals focused on the statements given by LaVelle, which indicated that LaVelle did not have firsthand knowledge of Petitioner's location between the time Petitioner left Crimes Towing in the mid-afternoon and around 9:15 p.m. to 9:30 p.m. However, the Michigan Court of Appeals' conclusion is unjustified. Lankford's duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his [ ] client's guilt or innocence." *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir.2005).

Even though LaVelle was unable to provide the investigator with an alibi for Petitioner at the time the murder was committed, LaVelle identified two other potential alibis—Damar and Damion. (Hr. Tr. 24–25, Sept. 7, 2001.) Upon learning this information, Lankford was under a duty to interview these witnesses.[4]

The Michigan Court of Appeals' decision is objectively unreasonable based on the established Supreme Court authority discussed herein. This Court finds no reasonable decision made by Lankford justifying his failure to contact Damar since he was explicitly mentioned as an alibi witness by Petitioner. Lankford himself initially recognized that Damar might serve as an important witness. (Hr. Tr. 14–15, 34, Sept. 28, 2001.) Further, had Lankford or his investigator spoken with Damar, Damar could have provided information about Darius, another potentially important witness. (*Id.* At 9–11.) After his investigator spoke to LaVelle, Lankford's duty to make a reasonable investigation was not complete, it was just beginning. "Where counsel fails to investigate and interview promising witnesses, and therefore ha[s] no reason to believe they would not be valuable in securing [defendant's] release, counsel's inaction constitutes negligence, not trial strategy." *Workman v. Tate,* 957 F.2d 1339, 1345 (6th Cir.1992) (citations omitted); *see also Nealy v. Cabana,* 764 F.2d 1173, 1177 (5th Cir.1985) (finding that "counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case").

Just as Lankford's duty to investigate did not end upon his investigator contacting LaVelle, it also did not end when the

4. The Court notes that Lankford was under a duty to contact Damar before his investigator spoke to LaVelle because Petitioner identified him as an alibi witness. LaVelle's statement to Lankford's investigator further magnified the need to speak to Damar.

investigator left his business card at Crimes Towing, although whether this actually occurred is disputed. The Court cannot find that Lankford exhibited "reasonableness under prevailing professional norms." *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. In so holding, the Court is not holding that Lankford or his investigator actually had to *speak* with Damar. Damar could have purposely avoided speaking with them and Lankford could have done little about this. This was not the situation, however, as Damar testified that he would have spoken with them and also testified at Petitioner's trial. (Hr. Tr. 20, Sept. 28, 2001.) Lankford was under a duty to reasonably investigate, which entails, at the bare minimum, asking for Damar's phone number or address and reasonably attempting to contact him. As Petitioner appropriately notes, "[t]his sequence of events shows just how unreasonable it was for a seasoned attorney like Lankford to leave it up to teenagers to get back in touch with him about important alibi evidence in a murder trial." (Br. Pet. for Writ of Habeas Corpus 20.)

### 2. Prejudice

After finding deficient performance on the part of Petitioner's trial counsel, the Court must determine whether prejudice necessarily results therefrom. Prejudice results if there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The Michigan Court of Appeals did not reach this question since it concluded that Lankford was not ineffective. *See People v. Avery,* No. 229324, 2002 WL 31264726, at *2 (Mich.Ct.App. Oct.8, 2002). Thus, the Court analyzes the matter *de novo. See Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).

Had Lankford interviewed all of Petitioner's potential alibi witnesses and had them testify at trial, this Court cannot say that the result of Petitioner's trial would have been the same. There is a sufficient probability that the verdict would have been different, which undermines this Court's confidence in the verdict. If Damar's testimony was believed by the jury, it would be almost impossible to find Petitioner guilty. "[O]ur Constitution leaves it to the jury, not the judge, to evaluate the credibility of witnesses in deciding a criminal defendant's guilt or innocence." *See Ramonez,* 490 F.3d at 490. "[W]eighing the prosecution's case against the proposed witness testimony is at the heart of the ultimate question of the *Strickland* prejudice prong, and thus it is a mixed question of law and fact not with the Section 2254(e)(1) presumption." *Id.* at 491.

In deciding that Petitioner was prejudiced, the Court places emphasis on the weak evidence resulting in Petitioner's verdict. *See Strickland,* 466 U.S. at 696, 104 S.Ct. 2052 (concluding that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). The prosecution's case against Petitioner relied heavily on the inconsistent and suspect eyewitness testimony of Jacklyn Barker. Barker testified that between 7:30 p.m. to 8:00 p.m. on January 15, she heard a car pull up in front of her house. (Trial Tr. 70, June 27, 2000.) Upon going to the door to see who was there, she heard a "pop," which she thought was a gunshot. (*Id.* at 71–72.) She then "peeked" through her glass door and saw three men emerge from a car, which was later identified as the victim's car. (*Id.* at 72–74.) It was dark outside and part of the car was in a shadow from a streetlight across the road. (*Id.* at 70–71, 87–88, 95.)

Nevertheless, Barker testified that she saw Petitioner exit the car from the front passenger seat, which was facing away from her house, even though she only saw Petitioner for "a few movements" and "couldn't see his face." (*Id.* at 74–76.) Although Barker testified at the preliminary hearing that Petitioner was smiling when he exited the car (Pre.Hr.12, Feb. 23, 2000), she changed her testimony at trial and admitted that she could not see Petitioner's facial expression. (Trial Tr. 75–76, June 27, 2000.) When asked by the prosecutor why her testimony had changed, she denied previously lying and could only respond "I don't know." (*Id.* at 76.) The Court can decipher no reason for this inconsistency.

When she was questioned on the night of the murder, Barker told the police that she did not recognize the individuals who exited the car. (*Id.* at 103–05.) A day or two later, however, Barker remembered who the men were but did not immediately tell the police because, she suggests, she was afraid. (*Id.* at 79–80.) Moreover, Barker later testified that she has known Petitioner, as well as the other two men, from her neighborhood since she was little. (*Id.* at 73–74.) These inconsistencies lead the Court to conclude that the prosecution's case against Petitioner was weak and that there is a sufficient probability that an alibi defense would have likely resulted in a different verdict. On January 19, 2000, Barker failed to pick any of the three men out of a lineup, but did pick another individual out of one of the lineups, although this individual was never charged. (*Id.* at 106–08.) Barker failed to provide a sufficient explanation for why she did not pick Petitioner out of the initial lineup, given that she has known him most of her life.

Of course, the Court does not intend to assess the credibility of Barker; rather, the Court simply finds that Barker's inconsistent statements, unexplainable actions, and the conditions surrounding her "eyewitness testimony" gave the prosecution a very weak case on which to convict Petitioner. Because of the weakness of the prosecution's case, the Court finds that there is a sufficient probability that, but for Lankford's failure to pursue an alibi defense, the verdict would have been different. It is apparent to the Court that had an alibi witness been produced, the jury could have discredited Barker's testimony and acquitted Petitioner.

### B. Failure to Object Claim

Petitioner argues that his second claim for habeas relief, involving improperly admitted hearsay testimony, was erroneously denied in the Report. At Petitioner's trial, a witness testified to a statement made by Petitioner's co-defendant, Recho Burns, which indicated that Burns threatened to kill the victim. Before trial, the prosecutor moved to admit this testimony but the court denied the motion since the testimony did not relate to Petitioner. At trial, however, the prosecutor admitted this evidence despite the court's earlier ruling. Petitioner's trial counsel failed to ask for the jury to be excused, object, or request any type of limiting instruction.

There is no question that Petitioner's counsel erred; however, the question is whether Petitioner suffered prejudice. The Michigan Court of Appeals and the Magistrate Judge both concluded that Petitioner did not. For the reasons set forth in the Report, the Court finds that Petitioner suffered no prejudice. Specifically, no mention was made of Petitioner in the testimony and Petitioner was in no way implicated. The jury was appropriately instructed to only consider evidence properly admitted against Petitioner, which would not be this testimony. Petitioner

has not met the demands of 28 U.SC. § 2254(d).

### C. Certificate of Appealability

Pursuant to 28 U.S.C. § 2253, the Court must also assess whether to grant the issuance of a certificate of appealability to Petitioner on his failure to object claim against his trial attorney. *See Castro v. United States*, 310 F.3d 900, 903 (6th Cir. 2002) (holding that § 2253 analysis may be done at the time the claim for relief is determined). Under the statute and the United States Supreme Court's determinations in *Slack v. McDaniel*, 529 U.S. 473, 483–84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000), and *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), a certificate shall issue if the resolution of the petition is debatable among reasonable jurists or adequate to deserve encouragement for some other reason. Furthermore, the analysis of the sufficiency of the claims must be individually directed to the substance of the constitutional claims asserted. *Murphy v. Ohio*, 263 F.3d 466, 466–67 (6th Cir.2001); *Porterfield v. Bell*, 258 F.3d 484, 486 (6th Cir. 2001).

Upon review, the Court finds that reasonable jurists would not find Petitioner's positions debatable with respect to the substantive grounds for denying relief as to the claim asserted. Accordingly, a certificate of appealability will be denied on Petitioner's failure to object claim.

### IV. CONCLUSION

For the reasons set forth above, a Writ of Habeas Corpus shall enter granting Petitioner Chamar Avery's Petition for Writ of Habeas Corpus, instructing the State of Michigan to either release Petitioner from custody or afford him a new trial within 120 days, adopting the Report and Recommendation, denying Respondent John Prelesnik's Objections to the Report and Recommendation, denying Petitioner's Objections to the Report and Recommendation, and denying a certificate of appealability as to Petitioner's failure to object claim.

### *REPORT AND RECOMMENDATION*

ELLEN S. CARMODY, United States Magistrate Judge.

This matter is before the Court on Avery's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Avery's petition be **granted.**

### *BACKGROUND*

On January 15, 2000, between 7:30 and 8:00 p.m., Geoffrey Stanca was robbed and murdered. Petitioner and two others were implicated in this crime. Petitioner was subsequently charged with felony murder and possession of a firearm during the commission of a felony. Following a jury trial, Petitioner was acquitted of first degree murder and possession of a firearm during the commission of a felony, but was convicted of second degree murder. Petitioner was sentenced to serve 20–50 years in prison. Petitioner appealed his conviction to the Michigan Court of Appeals asserting the following claims:

I. In a trial with two defendants and two juries, Mr. Avery was denied a fair trial and his constitutional right of confrontation when the trial court without a cautionary instruction, admitted an incriminating extrajudicial declaration by the co-defendant which was irrelevant, highly prejudicial, and inadmissible hearsay as to Defendant Avery; trial counsel was constitutionally ineffective for failing to review his objection to the admission of the threat testimony or to request that

Defendant's jury be removed while Mr. Budd testified.

A. The threat testimony was unconnected to Defendant, irrelevant, and unfairly prejudicial.

B. The threat testimony was inadmissible hearsay as to Defendant Avery.

C. Admission of the hearsay statement denied Mr. Avery his right to confrontation.

D. Trial counsel was ineffective for failing to renew his objection to Victor Budd's testimony about Mr. Burns' threat to harm Mr. Stanka, and for failing to ask that Defendant Avery's jury be excused while Mr. Budd testified.

II. The prosecutor committed reversible error and violated Defendant's federal and state constitutional right to a presumption of innocence when he suggested that the Defendant had some obligation to present a defense.

The Michigan Court of Appeals remanded the matter for a *Ginther* hearing on Petitioner's ineffective assistance of counsel claim. *People v. Avery*, No. 229324, Order (Mich.Ct.App., May 30, 2001). The court of appeals retained jurisdiction in the matter, however. *Id.* Following the presentation of evidence, the trial court determined that Petitioner had not been denied the effective assistance of counsel. (Hearing Transcript, Nov. 2, 2001, 50–63). Petitioner then filed in the Michigan Court of Appeals a supplemental brief in which he asserted the following additional claims:

I. Defendant was denied effective assistance of counsel and a fair trial by his attorney's failure to present his alibi defense or produce alibi witnesses at trial.

II. Mr. Avery must be resentenced because the wrong sentencing grid was used at sentencing.

The court of appeals affirmed Petitioner's conviction. *People v. Avery*, No. 229324, Opinion (Mich.Ct.App., Oct. 8, 2002). Asserting the same claims, Petitioner moved in the Michigan Supreme Court for leave to appeal. The court denied Petitioner's request for leave to appeal, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Avery*, No. 122602, Order (Mich., April 29, 2003). On April 26, 2004, Avery submitted the present petition for writ of habeas corpus in which he asserts the following claims:

I. Petitioner was denied his right to the effective assistance of counsel because of his trial attorney's failure to investigate, contact and interview Petitioner's alibi witnesses, and his failure to produce them at trial.

II. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to object to hearsay testimony before Avery's jury which was only admissible as to Petitioner's co-defendant.

### STANDARD OF REVIEW

Avery's petition, filed April 26, 2004, is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254. The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unrea-

sonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also, Lancaster v. Adams,* 324 F.3d 423, 429 (6th Cir.2003).

Prior to *Williams,* the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists." *Gordon v. Kelly,* 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also, Blanton v. Elo,* 186 F.3d 712, 714–15 (6th Cir.1999). The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court. *Williams,* 529 U.S. at 409, 120 S.Ct. 1495.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411, 120 S.Ct. 1495. Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell,* 535 U.S. at 694, 122 S.Ct. 1843; *Williams,* 529 U.S. at 409–12, 120 S.Ct. 1495. Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Lancaster,* 324 F.3d at 429 (quoting *Williams,* 529 U.S. at 407, 120 S.Ct. 1495).

Furthermore, for a writ to issue, the Court must find a violation of Supreme Court authority. The Court cannot look to lower federal court decisions in determining whether the relevant state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law. *See Harris v. Stovall,* 212 F.3d 940, 943–44 (6th Cir.2000).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the factual findings of the state court are presumed to be correct. *See Warren v. Smith,* 161 F.3d 358, 360 (6th Cir.1998) (citing 28 U.S.C. § 2254(e)(1)). Petitioner can rebut this presumption only by clear and convincing evidence. *Id.*

The deferential standard articulated by the AEDPA, however, does not apply if the state has failed altogether to review a particular claim. As the Sixth Circuit has indicated, where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts a *de novo* review. *See McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir.2003); *see also Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall,* 340 F.3d 433, 437 (6th Cir.2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

### *ANALYSIS*

#### I.  Failure to Investigate Claim

Petitioner asserts that his trial attorney did not properly investigate his alibi defense or the witnesses in support thereof. Petitioner asserts that this failure deprived him of his Sixth Amendment right to the effective assistance of counsel. The Michigan Court of Appeals rejected this claim. For the reasons articulated below, the undersigned concludes that this decision represents an unreasonable application of clearly established Supreme Court authority.

As noted above, Geoffrey Stanca was robbed and murdered on January 15, 2000 between 7:30 and 8:00 p.m. (Trial Transcript, June 27, 2000, 35–40, 53–54, 70–78, 111–18, 121–23). Petitioner was charged in connection with this crime and on or about February 11, 2000, David Lankford was appointed to represent him. (Hearing Transcript, Sep. 7, 2001, 21–22). During a subsequent meeting between the two, Petitioner provided counsel with the names of several individuals with whom he claimed to have associated on the date of the subject offense—John Crimes, Sr., and his sons, LaVelle and Damar. *Id.* at 22–23. Petitioner also provided counsel with the address of Crimes Towing and Auto Service at which these individuals could be contacted. Counsel directed an investigator to attempt to speak with these individuals. *Id.*

According to counsel,[1] the investigator went to Crimes Towing and spoke with LaVelle Crimes on May 23, 2000. *Id.* at 23–27. LaVelle informed the investigator that Petitioner left his vehicle at Crimes Towing on January 14, 2000, for repairs. *Id.* at 24–25. Petitioner returned to Crimes Towing in the "mid afternoon" of the following day and went with Damar (and another individual referred to as Jellyroll) to a local auto parts store. *Id.* at 24–25, 41. After returning from the auto parts store, Petitioner and Damar "went to Damion's house on Ardmore." *Id.* Later that evening, between 9:15 and 9:30 p.m., Petitioner and Damar returned to Crimes Towing, at which point Petitioner paid for the repairs to his car and departed. *Id.* at 24–25. Counsel later obtained a copy of the receipt establishing that Petitioner's car was repaired at Crimes Towing on January 15, 2000. *Id.* at 25–26.

The investigator did not speak to anybody else during this visit. *Id.* at 26–27. Counsel testified that he *believed* that the investigator left his card with somebody at Crimes Towing "with the request that Damar and/or Damion contact us." *Id.* at 26–27. Counsel reported that he instructed the investigator to continue to "attempt to make telephonic contact" with the Crimes. *Id.* at 27–28. Counsel testified that he later "directed" the investigator to "make physical contact one more time" with the individuals identified by Petitioner. *Id.* at

---

**1.** The investigator did not testify at the *Gin-*     *ther* hearing.

28. Counsel acknowledged, however, that he did not know if the investigator ever complied with his instructions. *Id.*

Counsel reported that the investigator never attempted to contact Damion. *Id.* at 29–32. As for Damar Crimes, the investigator never obtained Damar's home address or phone number and never asked John Crimes, Sr. for assistance contacting Damar. *Id.* at 29–33. Counsel testified that he never personally spoke with La-Velle Crimes, John Crimes, Sr., Damar Crimes, or Damion. *Id.* at 31. Counsel subsequently informed Petitioner that he would not question his alibi witnesses at trial because he was unsure what they "would say or how they would present." *Id.* at 32.

To demonstrate that he was deprived of the right to the effective assistance of counsel, Petitioner must first establish that his attorney's performance was deficient in that it "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Judicial scrutiny of attorney performance, however, is "highly deferential." *Combs v. Coyle,* 205 F.3d 269, 278 (6th Cir.2000) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). Thus, the question is whether "in light of all the circumstances viewed at the time of counsel's conduct, counsel's 'acts or omissions were outside the range of professionally competent assistance.' " *Combs,* 205 F.3d at 278 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

Petitioner must further establish that he suffered prejudice resulting from his attorney's deficient performance. *Rompilla v. Beard,* 545 U.S. 374, 380, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052). To establish prejudice, Petitioner must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Combs,* 205 F.3d at 278 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Combs,* 205 F.3d at 278 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). An examination of prejudice, however, "must not focus solely on mere outcome determination; attention must be given to 'whether the result of the proceeding was fundamentally unfair or unreliable.' " *Combs,* 205 F.3d at 278 (quoting *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)).

A. Deficient Performance

In *Strickland,* the Supreme Court recognized that

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

■ Accordingly, the "relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores–Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (citing *Strickland,* 466 U.S. at 688, 104

S.Ct. 2052); *see also, Clinkscale v. Carter,* 375 F.3d 430, 443 (6th Cir.2004) (citations omitted). Thus, a purportedly strategic decision cannot be considered reasonable where counsel "has failed to investigate his options and make a reasonable choice between them." *Combs,* 205 F.3d at 288 (quoting *Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991)).

With respect to counsel's meager attempts to investigate Petitioner's alibi, the Michigan Court of Appeals concluded that
> While defendant complains that counsel failed to contact Damar Crimes, the investigator did in fact locate and interview another one of the potential witnesses and left his business card with a request that the other potential alibi witnesses contact him. Counsel also had his investigator follow up by telephone and again in person, in an attempt to contact these other witnesses. Given these circumstances, we conclude that counsel adequately investigated. Moreover, counsel made a valid strategic decision not to present such a defense because the information he obtained did not provide defendant with an alibi for the time of the crime.

*People v. Avery,* No. 229324, Opinion at 2 (Mich.Ct.App., Oct. 8, 2002).

This conclusion cannot withstand scrutiny. First, the court of appeals has misconstrued the testimony presented at the *Ginther* hearing. While the court correctly observed that the investigator interviewed LaVelle Crimes, the court inaccurately states as fact that the investigator requested that "the other potential alibi witnesses contact him." As discussed above, there was no evidence presented at the *Ginther* hearing establishing what—if anything—the investigator did to establish contact with "the other potential alibi witnesses." Rather, Petitioner's trial counsel testified that it was his *understanding* that the investigator undertook such action.

Unsubstantiated beliefs hardly constitute established facts.

The appellate court also stated that counsel "had his investigator follow up by telephone and again in person, in an attempt to contact these other witnesses." While not inaccurate, this observation is incomplete. Petitioner's counsel testified at the *Ginther* hearing that while he directed the investigator to undertake such follow-up action, he had absolutely no knowledge whether the investigator complied with his instructions. Moreover, counsel testified that he did not, himself, make any attempts to contact any of Petitioner's alibi witnesses.

The conclusion that "counsel adequately investigated" Petitioner's alibi defense is unreasonable by any standard. As noted above, counsel had a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." This duty to investigate "derives from counsel's basic function which is 'to make the adversarial testing process work in the particular case.' " *Towns v. Smith,* 395 F.3d 251, 258 (6th Cir.2005) (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). Counsel's duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns,* 395 F.3d at 258 (citations omitted).

The investigator learned from LaVelle Crimes that on the date in question Petitioner had been at Crimes Towing before departing with Damar Crimes in the late afternoon to go to "Damion's house." LaVelle further informed the investigator that Petitioner and Damar returned to Crimes Towing later that evening after the repairs were completed on Petitioner's car. Thus, while LaVelle Crimes was unable to provide Petitioner with an alibi for the

time the crime was committed, he identified two individuals who might very well have been able to support an alibi defense. Because Damar and Damion appeared to possess information concerning Petitioner's guilt or innocence, counsel had a professional obligation to investigate the matter. *See Wiggins*, 539 U.S. at 527, 123 S.Ct. 2527 ("[i]n assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further").

As discussed above, however, counsel did not himself undertake any efforts to speak with Damar or Damion or determine whether they might be able to provide Petitioner with an alibi. While counsel instructed the investigator to make further attempts to contact potential alibi witnesses, counsel acknowledged that he did not know if the investigator complied with his instructions. While the Court recognizes that attorneys can satisfy their investigatory responsibilities through delegation to others, the attorney nonetheless bears the responsibility for ensuring that his instructions have been followed and that a proper investigation has been conducted. Considering the circumstances in this case, there exists no basis in reason to conclude that counsel conducted (either directly or indirectly) a sufficient investigation into Petitioner's potential alibi defense. The minimal investigation which counsel did conduct identified two individuals who it appeared could provide an alibi for Petitioner during the critical time period. Counsel's efforts to contact these individuals fell well below the range of professionally competent assistance compelled by the Constitution. The decision by the Michigan Court of Appeals to the contrary is objectively unreasonable in light of the authority discussed herein.

Moreover, the determination by the Michigan Court of Appeals that counsel's decision not to present an alibi defense constituted a "valid strategical decision," is likewise infirm. As previously noted, the question is not whether counsel's decision was strategic, but whether the decision was reasonable. A decision cannot, however, be considered reasonable where the attorney "has failed to investigate his options and make a reasonable choice between them." Counsel failed to sufficiently investigate whether there existed a possible alibi defense in this matter. Accordingly, his decision to not present such a defense was unreasonable. The decision by the Michigan Court of Appeals to the contrary is objectively unreasonable in light of the authority discussed herein.

B. Prejudice

While Petitioner has established that his trial counsel rendered deficient performance with respect to investigating his alibi defense, Petitioner is entitled to relief only if he can also demonstrate that he suffered prejudice as a result of his attorney's shortcomings. As discussed in the preceding section, the Court was required to evaluate the state court decision regarding the initial prong of the *Strickland* analysis pursuant to the deferential standard articulated in the AEDPA. However, because the state appellate court found counsel's representation adequate it never addressed the question whether Petitioner was prejudiced by counsel's deficient performance. In such a circumstance, the Court is not required to accord deference to the state courts, but instead analyzes the matter *de novo*. *See, e.g., Rompilla*, 545 U.S. at 388, 125 S.Ct. 2456 ("[b]ecause the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*"); *see also, Wiggins v. Smith*, 539 U.S. 510, 123

S.Ct. 2527, 2542, 156 L.Ed.2d 471 (2003); *McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir.2003); *Maples v. Stegall,* 340 F.3d 433, 437 (6th Cir.2003).

Damar Crimes also testified at the *Ginther* hearing. Damar testified that on January 15, 2000, he arrived at Crimes Towing at "about" 6:00 p.m. (Hearing Transcript, September 28, 2001, 7–8). He and Petitioner departed Crimes Towing at "about" 7:00 p.m. and walked to Darius Boyd's house, which was "2–3" blocks away. *Id.* at 9–11. Darius Boyd was the brother of Damion Boyd. *Id.* at 9. Petitioner and Damar departed Darius' house between 8:00 p.m. and 8:30 p.m. *Id.* at 11. The pair departed after Damar received a telephone call from LaVelle Crimes informing him that the repairs to Petitioner's car were completed. After receiving this telephone call Petitioner and Damar walked back to Crimes Towing, arriving between 8:30 p.m. and 8:45 p.m. *Id.* Damar testified that he had been with Petitioner the entire time since leaving Crimes Towing earlier that day. *Id.* at 11. After arriving back at Crimes Towing, Petitioner paid for the repairs after which he and Damar left (in Petitioner's car) to visit one of Damar's friends. *Id.* at 12. At approximately 9:30 p.m. Petitioner drove Damar back to Darius's house. *Id.* at 12–13. Damar testified that he would have testified at Petitioner's trial if he had been requested to do so. *Id.* at 20. Petitioner also testified at the *Ginther* hearing and provided testimony consistent with that offered by Damar Crimes. (Hearing Transcript, Nov. 2, 2001, 16–31).

As previously stated, to establish that he was prejudiced by his attorney's deficient performance Petitioner must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." In this context, reasonable probability has been defined as a probability "sufficient to undermine confidence in the outcome." The Court must also consider whether counsel's deficient performance rendered Petitioner's trial "fundamentally unfair or unreliable."

Damar's testimony, if believed, is utterly inconsistent with a finding of guilt and would certainly have resulted in an acquittal. The Court recognizes that there exist grounds on which to challenge the credibility of Damar's testimony, as is the case with practically every witness. Such does not detract from the Court's conclusion, however, because the "actual resolution of the conflicting evidence, *the credibility of witnesses,* and the plausibility of competing explanations is exactly the task to be performed by a rational jury, considering a case presented by competent counsel on both sides." *Ramonez v. Berghuis,* 490 F.3d 482, 490 (6th Cir.2007) (emphasis in original). In other words, it is not for this Court to pass on Damar's credibility. Rather, the Court must determine only whether Damar's testimony—if believed—is sufficient to undermine confidence in the jury verdict. Damar's testimony—if believed—is obviously inconsistent with the jury verdict in this matter as it provides Petitioner with an alibi for the time period in question.

Petitioner's demonstration of prejudice is further supported by the weakness of the State's case. *See Clinkscale,* 375 F.3d at 445 (quoting *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052) ("a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). The only evidence in this case against Petitioner was the alleged eyewitness testimony of Jacklyn Barker. As courts recognize, there exist "grave reservations concerning the reliability of eyewitness testimony." *Clinkscale,* 375 F.3d at 445. This concern about eyewitness testi-

mony is heightened in this case given Barker's testimony.

Barker testified that on January 15, 2000, between 7:30 p.m. and 8:00 p.m., she witnessed a car park in front of her house. (Trial Transcript, June 27, 2000, 70–71). Barker proceeded to her front door to "look out" because she "figured somebody was coming to [her] house." *Id.* at 71. As Barker was walking to her front door she heard "a pop sound, like an isolated gun shot." *Id.* at 72. Barker testified that when she arrived at her front door she "didn't look out [the] door because [the] door is all glass." Instead, she "just peeked out." *Id.* Barker testified that it was dark outside and that the nearest street light was "about a house down across the street." *Id.* at 71. Despite these circumstances, Barker testified that she observed three people inside the car. *Id.* at 72. She reported that these three people, one of whom she identified as Petitioner, exited the car and ran away. *Id.* at 72–74, 98–99. Barker identified Petitioner despite acknowledging that she only saw him for "a few movements" and "couldn't see his face." *Id.* at 75–76. After these three individuals ran away, Barker witnessed Geoffrey Stanca "laying on the ground." *Id.* at 77–78.

Barker also testified that she had known Petitioner and his family "since [she] was little." *Id.* at 73. Despite having known Petitioner for many years, when Barker was questioned by the police immediately following the shooting, she reported that she did not recognize any of the individuals involved in the crime. *Id.* at 77, 103–05. On January 19, 2000, four days after the incident, Barker participated in a series of lineups conducted by the police. *Id.* at 106. Petitioner was included in the initial lineup, but Barker did not identify him as one of the three individuals she witnessed on the night of Stanca's murder. *Id.* at 107. While the jury was certainly free to believe Barker's account, her identification of Petitioner is certainly weak in light of two earlier disavowals.

Barker's suspect identification testimony was the only evidence supporting Petitioner's conviction. In such a circumstance, the failure by Petitioner's trial counsel to investigate Petitioner's alibi defense deprived Petitioner of what appears to have been his strongest defense. Counsel's failure can only be characterized as prejudicial to Petitioner's defense. *See Clinkscale,* 375 F.3d at 445. Thus, the Court finds that Petitioner has demonstrated that he suffered prejudice as a result of his trial counsel's deficient performance. Accordingly, Petitioner is entitled to habeas relief.

## II. Failure to Object Claim

Petitioner was tried with a co-defendant, Recho Burns, in a joint proceeding with separate juries. Prior to trial, the judge to whom the case was then assigned ruled that certain evidence was admissible only as to co-defendant Burns. (Hearing Transcript, June 8, 2000, 20–58). Specifically, the judge ruled that testimony by Viorel Bud that co-defendant Burns had told him that he was going to kill Geoffrey Stanca was admissible only as to Burns, but not against Petitioner. *Id.* By the time of Petitioner's trial, the case had been reassigned to a different judge. When Bud testified at trial, however, Petitioner's counsel neither requested that Petitioner's jury be excused nor objected to the aforementioned testimony. (Trial Transcript, June 27, 2000, 42–52). Moreover, Petitioner's attorney never requested any type of limiting instruction regarding Bud's testimony. Petitioner asserts that counsel's failure deprived him of his Sixth Amendment right to the effective assistance of counsel.

In rejecting this particular claim, the Michigan Court of Appeals concluded that "[w]hile counsel may have erred, we conclude that defendant has not shown a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *State v. Avery*, No. 229324, Opinion at 2 (Mich.Ct.App., Oct. 8, 2002). There is no question that counsel's performance in this regard fell well below any objective standard of reasonableness. However, Petitioner cannot establish that the determination by the Michigan Court of Appeals that he suffered no prejudice therefrom is contrary to, or involved an unreasonable application of, clearly established federal law.

Viorel Bud testified to disputes that he witnessed between Geoffrey Stanca and Recho Burns. (Trial Transcript, June 27, 2000, 43–52). Bud testified that during two of these encounters Burns threatened to kill Stanca. Bud made absolutely no mention of Petitioner and was never even asked about Petitioner. *Id.* In short, the evidence in question did not implicate Petitioner in Stanca's murder. At the conclusion of Petitioner's trial the jury was instructed to "only consider the evidence that has been properly admitted." (Trial Transcript, June 28, 2000, 73).

To conclude that Petitioner's jury was influenced by Bud's testimony would require the Court to assume that the jurors did not follow the instructions given to them by the trial court and that they instead found Petitioner guilty because of a perceived association with his co-defendant. While the jurors may have made such an improper connection, the Court finds that it is much more likely that the jurors convicted Petitioner based solely on the eyewitness testimony of Jacklyn Barker. To conclude otherwise would require the Court to engage in rampant speculation which, in the Court's estimation, is an insufficient basis to grant habeas relief in light of the substantial deference which this Court must accord under the AEDPA to the decision by the Michigan Court of Appeals.

The Michigan Court of Appeals determined that counsel's failure to object to Bud's testimony did not deprive Petitioner of the right to the effective assistance of counsel. While this Court may have reached a different conclusion on the matter, it nonetheless finds that the decision of the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, its decision was not based on an unreasonable determination of the facts in light of the evidence presented. As such, this claim presents no issue on which habeas corpus relief may be granted.

### *CONCLUSION*

For the reasons articulated herein, the undersigned concludes that Petitioner is being confined in violation of the United States Constitution. Accordingly, the undersigned recommends that Avery's petition for writ of habeas corpus be **granted.** The undersigned further recommends that the State of Michigan either release Petitioner from custody or afford him a new trial within 120 days.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).