OPINION
{¶ 1} Defendant-appellant, Kevin Darrah, challenges his conviction in the Warren County Common Please Court for rape.
 {¶ 2} On March 27, 2006, appellant was indicted on one count of rape, with a specification that the victim was a child under the age of ten, a felony of the first degree, in violation of R.C. 2907.02(A)(1)(b) (Count 1), and one count of gross sexual imposition, a felony of the third degree, in violation of R.C. 2907.05(A)(4) (Count 2). Appellant was *Page 2 
arrested one day later. After a jury trial, appellant was found guilty of Count 1 with a specification that the victim was under the age of ten. Count 2 was submitted to the jury as a lesser included offense of Count 1, and because the jury found appellant guilty on Count 1, the jury did not consider the lesser included offense. The trial court imposed a sentence of life imprisonment on Count 1. Appellant appealed and this court affirmed his conviction in State v. Darrah, Warren App. No. CA2006-09-109, 2007-Ohio-7080.
 {¶ 3} On March 27, 2008, appellant filed an application to reopen his appeal, arguing that his appellate counsel failed to properly assign as error constitutional violations that allegedly occurred at trial. This court granted appellant's motion to reopen his appeal, and appellant raises the following assignment of error.
 {¶ 4} "IT WAS ERROR TO PERMIT EVIDENCE OF DARRAH'S SILENCE, WHERE DARRAH'S SILENCE WAS PREMISED ON HIS COUNSEL'S ADVICE, AND OCCURRED AFTER HE HAD BEEN ARRESTED AND INDICTED FOR RAPE."
 {¶ 5} Appellant argues that the state improperly elicited testimony from an officer regarding appellant's post-arrest, post-indictment silence in violation of his constitutional rights. Further, appellant argues that his appellate counsel was ineffective for failing to raise these issues in his direct appeal.
 {¶ 6} In determining whether appellate counsel's performance constitutes ineffective assistance, we must determine whether counsel's actions fell below an objective standard of reasonableness and that appellant was prejudiced as a result. Strickland v. Washington (1984),466 U.S. 668, 687-688, 694, 104 S.Ct. 2052; State v. Sheppard,91 Ohio St.3d 329, 2001-Ohio-52. To show ineffective assistance, appellant must prove that appellant counsel was deficient for failing to raise the issues he now presents, and that there was a reasonable probability of success had he presented those claims on appeal. Sheppard at 329, citingState v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. *Page 3 
 {¶ 7} In general, a defendant's post-arrest silence cannot be used against him. Doyle v. Ohio (1974), 426 U.S. 610, 96 S.Ct. 2240. "[P]ost-arrest silence is inherently ambiguous since the silence may reflect only the defendant's exercise of his constitutional right to remain silent. * * * Any comment which infers that the defendant is guilty because he remained silent subverts the guarantees afforded him by the Fifth Amendment of the Constitution of the United States."State v. Willis, Cuyahoga App. No. 90956, 2008-Ohio-6156, quotingState v. Williams (1979), 64 Ohio App.2d 271, 276.
 {¶ 8} In addition, "the use of pre-arrest silence as substantive evidence of guilt is an impermissible burden upon the exercise of the Fifth Amendment privilege." State v. Leach, 102 Ohio St.3d 135, 139,2004-Ohio-2147, ¶ 28, citing Combs v. Coyle (C.A.6, 2000), 205 F.3d 269,285. However, the Leach court also distinguished the use of pre-arrest silence for impeachment purposes and held:
 {¶ 9} "When a defendant testifies at trial, the defendant has cast aside his cloak of silence. Thus, use of pre-arrest silence as impeachment evidence is permitted because it furthers the truth-seeking process. Otherwise, a criminal defendant would be provided an opportunity to perjure himself at trial, and the state would be powerless to correct the record. But using a defendant's prior silence as substantive evidence of guilt actually lessens the prosecution's burden of proving each element of the crime and impairs the sense of fair play underlying the privilege." Leach at ¶ 33. (Internal citations omitted.)
 {¶ 10} According to the record, there was testimony at appellant's trial regarding both appellant's pre-arrest and post-arrest silence. Appellant testified in his own defense, and the following transpired during appellant's direct examination:
 {¶ 11} "Defense counsel: When was the first time that you became aware of these allegations?
 {¶ 12} "Appellant: It was kind of a strange event, the way that it happened. I got an *Page 4 
initial call from Detective [James] Engelhardt * * * . I'm sorry, I can't even remember the date now. My mind has gone blank. But this one evening, we came home from work and there was a message on my answering machine from Detective Engelhardt, that he was working on a case and that he needed to talk with me, and he asked me to call him as soon as possible the next day. So at that point, I didn't know what it was about. * * * I assumed that it had maybe something to do with a [Court Appointed Special Advocate] case that I worked with previously. * * * And so at that point I thought well maybe it had to do with a child * * *. So what I did was, the next day, I called Detective Engelhardt's office and I left him a message. He wasn't there at the time * * * So then I think it was later that day he called me * * * back, and that's when he informed me that there were some criminal allegations that had been filed against me. And I mean * * * at that point I was floored. I was shocked. I still didn't know what it was that these criminal allegations were.
 {¶ 13} "And he asked me at that time if I would come in and make a statement. And initially I agreed with him and we actually did set up a time for me to come in and make a statement. But when I got off the phone, I felt that, because * * * he did say it was of a criminal nature, then I thought it was best that I do talk to an attorney to get some advice, about * * * what to do to make sure that * * * I was protecting my rights, and just [get] as much advice as possible, because I had never been in this situation before.
 {¶ 14} "So what I did is I called another attorney who * * * is handling a civil case of ours, and I asked his advice. And he advised me that I was under no obligation, by law, to go in and make any kind of statement. And he advised me that it would be best not to go in unless I had an attorney present.
 {¶ 15} "Well at that time I didn't have a criminal attorney or anything like that. So * * * I called Detective Engelhardt back and I told him that I was not going to come in and make a statement at that time, based on the advice of this attorney * * * Detective Engelhardt then, *Page 5 
at that point, told me what the allegations were. * * * I said I don't even know what I'm being charged with. And it was at that point that he said that I had inappropriately touched a child.
 {¶ 16} "And it is so hard to describe just how floored [and] shocked I was at that point, that * * * I was being * * * accused of something like this. And I was so stunned, I just [said] okay.
 {¶ 17} "And then he * * * asked me again, he said, `So are you or are you not going to come in?' And I said no, that I was not going to come in.
 {¶ 18} "And at the end of the conversation he said, `Okay. Well, there will be indictments that will be forthcoming.' And that was the end of the conversation at that point."
 {¶ 19} The state then cross-examined appellant, where the following transpired:
 {¶ 20} "Prosecutor: When did you find out [the identity of the victim]?
 {¶ 21} "Appellant: I'm sorry, I cannot remember.
 {¶ 22} "Q: You have no idea?
 {¶ 23} "A: I'm trying to remember when it was that I was officially told. And I want to say it was when I was arrested.
 {¶ 24} "Q: Isn't it fair to say that it didn't matter when you were told because you already knew?
 {¶ 25} "A: No, that's not fair to say, because I did not know."
 {¶ 26} Appellant's counsel then asked appellant on redirect examination if appellant was informed of the nature of the charges at some point in time between the time he was arrested and the time he was booked in jail, and appellant responded affirmatively.
 {¶ 27} The state later called Detective Engelhardt as a rebuttal witness, and the following transpired:
 {¶ 28} "Prosecutor: [When] was the first attempt [you made to contact appellant]? *Page 6 
 {¶ 29} "Witness: On Monday, the 6th of March, I left a phone message at his house."
 {¶ 30} "* * *
 {¶ 31} "Q: And what was the next contact with [appellant]?
 {¶ 32} "A: The next contact was the 7th, which was a Tuesday. I received a call, and [appellant] and I spoke. I told him that I had a case I was investigating in reference to a complaint that had come from [Alice T.], and I needed to talk to him about that and I would like to schedule an interview with him.
 {¶ 33} "Q: Okay. So you specifically mentioned Alice [T's] name when you talked to him on March 7th ?
 {¶ 34} "A: Yes, ma'am.
 {¶ 35} "Q: Did you say that it regarded Alice's daughter?
 {¶ 36} "A: No, ma'am.
 {¶ 37} "Q: Did you give any indication of the nature of the complaint?
 {¶ 38} "A: No, ma'am, I did not.
 {¶ 39} "* * *
 {¶ 40} "Q: Did he ask in any way what the allegation was about?
 {¶ 41} "A: No, ma'am, he never did.
 {¶ 42} "Q: Okay. And when was the next contact with him?
 {¶ 43} "A: I believe it was an hour, maybe two hours later, I received a call from him and he said he had spoken with [an] attorney, and that on the advice of that attorney, he was not going to come in and give a statement.
 {¶ 44} "* * *
 {¶ 45} "Q: Okay. And so finally, on March 27th, you then went and made an arrest?
 {¶ 46} "A: That's correct. *Page 7 
 {¶ 47} "Q: * * * Did * * * he receive the indictment that was filed against him?
 {¶ 48} "A: Yeah, we gave him a copy when [we booked] him in at the jail.
 {¶ 49} "Q: Okay. And have you had an opportunity through your career to see indictments for child sex offenses?
 {¶ 50} "A: That's correct.
 {¶ 51} "Q: And is it a practice that the child's name is not listed in the indictment?
 {¶ 52} "A: That's correct, they're never listed.
 {¶ 53} "Q: Okay. And is there any reference at all to who the specific child is?
 {¶ 54} "A: Not on the indictment.
 {¶ 55} "Q: Do you recall, on that date, did you talk to him about the specifics of the offense?
 {¶ 56} "A: No, ma'am. I had no conversation with him other than processing him into the jail. There was no discussion of the case at all.
 {¶ 57} "Q: He didn't say, `Who is this about; I have no idea what this is about?'
 {¶ 58} "A: No, ma'am.
 {¶ 59} "Q: Nothing?
 {¶ 60} "A: (Shaking head negatively)."
 {¶ 61} According to the record, it was appellant who first raised the issue of his knowledge of the allegations against him and his reactions upon discovering these allegations. When appellant testified in his own defense, he stated that he was "floored" and "shocked" over the allegation that he had inappropriately touched a child, and that he only discovered the child's identity upon receiving the indictment at the jail. Based on this testimony, the state was permitted to present a rebuttal witness to impeach appellant's credibility. See Leach,2004-Ohio-2147, ¶ 33. *Page 8 
 {¶ 62} Appellant argues that Det. Engelhardt's testimony went beyond impeachment of appellant's credibility, and that the detective's testimony also referenced appellant's post-arrest silence. The record indicates that while the state first asked Det. Engelhardt whether appellant inquired as to the nature of the charges on the date of the arrest, appellant's trial counsel did not object to the question, and further questioned the officer regarding both appellant's pre-and post-arrest silence during his cross-examination of the detective. According to the record, the following transpired during this cross-examination:
 {¶ 63} "Defense: Now you said * * * Mr. Darrah called you back and said he had spoken with an attorney?
 {¶ 64} "Witness: I believe it was roughly an hour.
 {¶ 65} "Q: Okay. And was there any further explanation from you or discussion from you regarding this?
 {¶ 66} "A: Other than that I had received a complaint from Alice [T.].
 {¶ 67} "Q: Okay. And I believe you indicated that you told him you would have no further contact and the next time would be more of a formal nature, something to that effect?
 {¶ 68} "A: I believe I told him that the next contact would be if there [were] any criminal charges.
 {¶ 69} "Q: Okay. And the next contact would have been March 27th?
 {¶ 70} "A: That's correct.
 {¶ 71} "Q: And that's when you physically arrested [appellant]?
 {¶ 72} "A: That's correct.
 {¶ 73} "Q: Okay. Do you recall if he was presented a copy of the indictment at the time or later on at the sheriff's department?
 {¶ 74} "A: I believe it was at the booking area in the jail. *Page 9 
 {¶ 75} "Q: Okay. Now do you recall where you arrested [appellant]?
 {¶ 76} "A: It was at his place of employment.
 {¶ 77} "Q: Was that locally[?]
 {¶ 78} "A: Yes. It was in Mason, I believe.
 {¶ 79} "* * *
 {¶ 80} "Q: And on the ride from Mason to the sheriff's department, was there any discussion; [did appellant] make any inquiries of what this was about?
 {¶ 81} "A: I don't believe so.
 {¶ 82} "Q: Okay. * * * I'm assuming you read his rights to him?
 {¶ 83} "A: There was no reason to read his rights to him, [because] I was not going to question him.
 {¶ 84} "Q: Okay. At some point in time did you make any explanation of what the nature of the charge was?
 {¶ 85} "A: I don't believe so. I believe we gave him a copy of the indictment at the jail and told him that's what the charges were.
 {¶ 86} "Q: Okay. But to the best of your recollection, you didn't present him a copy of the indictment when you arrested him?
 {¶ 87} "A: No. I believe the indictment, the physical copy, was given to him at the jail."
 {¶ 88} Then, on the state's redirect examination of the detective, the following transpired:
 {¶ 89} "Prosecutor: [D]id it strike you as unusual that [appellant] never asked you what the nature of the offense or the specific acts were?
 {¶ 90} "Witness: Yes, ma'am."
 {¶ 91} In isolation, it would seem that the state improperly commented on appellant's *Page 10 
post-arrest, silence. However, it was appellant who first raised the issue as to his reaction to the allegations during his direct examination. Moreover, the state did not belabor the issue of appellant's post-arrest silence when the issue first arose, and trial counsel could have objected to the question. See State v. King, Lake App. No. 2003-L-177, 2005-Ohio-4656. In fact, the testimony that appellant claims is most damaging was made during the state's redirect examination of the detective, after trial counsel elaborated on appellant's post-arrest silence during cross-examination. Therefore, appellant cannot show that he was prejudiced by the state's initial questioning on appellant's post-arrest silence. Accordingly, we find that appellant has failed to demonstrate that there was a reasonable probability of success had appellate counsel presented this on appeal.
 {¶ 92} Next, appellant argues that references to appellant's post-indictment silence at trial violated his Sixth Amendment right-to-counsel. Likewise, we find that appellant has failed to demonstrate that there was a reasonable probability of success had appellate counsel presented this on appeal based on the above analysis.
 {¶ 93} Further, we note that appellant has not, on his direct appeal or on reopening, specifically argued that his trial counsel was ineffective for failing to object to the state's initial question regarding his post-arrest, post-indictment silence. To the extent that appellant has impliedly argued that trial counsel's performance was deficient, we find that trial counsel's failure to object and subsequent cross-examination of the detective were deliberate trial tactics. Trial counsel's tactics included an attempt to mitigate the impeachment of appellant's testimony and to reiterate appellant's theory that he was innocent and surprised by the allegations. While these tactics ultimately were unsuccessful, we remind appellant that even debatable trial tactics do not constitute ineffective assistance of counsel.State v. Conway, 109 Ohio St.3d 412, 2006-Ohio-2815.
 {¶ 94} Appellant's assignment of error is overruled. *Page 11 
 {¶ 95} Judgment affirmed.
 YOUNG and POWELL, JJ., concur. *Page 1